# 23-7383-cv

## United States Court of Appeals

*for the*

## Second Circuit

JI DONG CHENG,

*Plaintiff-Appellant,*

– v. –

HSBC BANK USA, N.A.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

DANIEL A. SCHLANGER
SCHLANGER LAW GROUP, LLP
80 Broad Street, Suite 3103
New York, New York 10004
(212) 500-6114

– and –

BETH E. TERRELL
TERRELL MARSHALL LAW GROUP PLLC
936 N. 34th Street, Suite 300
Seattle, Washington 98103
(206) 816-6603
bterrell@terrellmarshall.com

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................ 1

II.    JURISDICTIONAL STATEMENT ................................................... 5

III.   STATEMENT OF THE ISSUES ....................................................... 5

IV.   STATEMENT OF THE CASE ........................................................... 6

   A.   Statutory And Regulatory Background ......................................... 6

   B.   The District Court's Decisions At Issue On This Appeal ............... 7

V.    FACTUAL BACKGROUND ............................................................. 10

   A.   HSBC Promises That Interest On Its Direct Savings Accounts Begins To Accrue The Same Business Day Customers Deposit Noncash Items ......................................................... 10

   B.   HSBC Did Not Apply Interest To Plaintiff's Deposits On The Same Business Day They Were Made ......................................................................................... 11

   C.   Appellant's Calls To HSBC ........................................................ 12

VI.   STANDARD OF REVIEW ............................................................... 12

VII.   SUMMARY OF ARGUMENT ......................................................... 14

VIII.  ARGUMENT ..................................................................................... 16

   A.   Terms And Conditions Relating To Accrual Of Interest Are Not Exempt From The EFTA's Disclosure Rules ......................................................................................... 16

   B.   Accrued Interest Owing To A Consumer But Not Credited To The Consumer's Account Constitutes A Charge Under The EFTA. ............................................................. 20

   C.   The Terms Of The Contract Are Not Ambiguous ........................ 23

   D.   Even If HSBC's Form Contract Were Deemed To Be Ambiguous, That Ambiguity Must Be Resolved Without Regard To Individual Accountholder's Subjective Understandings ............................................................................ 30

      1.   Consistent With This Court's Precedents, Sister Circuits And The Restatement (Second) of Contracts, Extrinsic Evidence Of Individual Accountholders' Subjective Intent Is Irrelevant To Interpretation Of Contracts Of Adhesion Such As The One At Issue Here. 30

      2.   Because Extrinsic Evidence Of Individual Accountholders' Subjective Intent Is Irrelevant To Interpretation Of Contracts Of Adhesion, Denial Of Class Certification Was Improper ......................................................................................... 36

IX.   CONCLUSION ................................................................................. 42

# TABLE OF AUTHORITIES

**Cases**

*151 West Assocs. v. Printsiples Fabric Corp*., 61 N.Y.2d 732, N.E.2d 1344, 472 N.Y.S.2d 909 (N.Y. 1984) ....................................................................35

*Akanthos Capital Mgmt., LLC v. CompuCredit Holdings Corp.,* 677 F.3d 1286 (11th Cir. 2012) .......................................................................................32

*Avila v. Riexinger & Assocs., LLC*, 817 F.3d 72 (2d Cir. 2016) ...............................7

*Bartle v. TD Ameritrade Holdings Corp.*, No. 20-00166-CV-W-BP, 2021 U.S. Dist. LEXIS 214158, (W.D. Mo. Sep. 15, 2021) .................................41

*Berenson v. Nat'l Fin. Servs.*, LLC, 403 F. Supp. 2d 133 (D. Mass. 2005) . 3, 22, 23

*Berkley Risk Adm'rs Co., LLC v. Wells Fargo Bank*, No. 06-2804 (PAM/JSM), 2008 U.S. Dist. LEXIS 132548 (D. Minn. Jan. 7, 2008) ..............................27

*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999).................14

*Cohen v. Laiti*, 98 F.R.D. 581 (E.D.N.Y. 1983) ....................................................37

*Cox v. Spirit Airlines, Inc.*, 786 F. App'x 283 (2d Cir. 2019)..................................24

*Credit Union Nat'l Asso. v. Bd. of Governors of Fed. Reserve Sys.*, 700 F. Supp. 1152 (D.D.C. 1988) .................................................................................28

*Deutsche Bank Secs., Inc. v. Rhodes*, 578..............................................................21

*Eke v. Bank of Am., N.A.,* No. 09-cv-488, 2009 WL 10688932 (E.D. Va. Nov. 12, 2009) ..........................................................................................................25

*Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014) ..........................32

*Gillis v. Respond Power, LLC*, 677 F. App'x 752 (3d Cir. 2017).................... 31, 38

*Great Lakes Ins. SE v. Andersson*, 66 F.4th 20 (1st Cir. 2023)..............................35

*Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2017 WL 4274196 (D. Nev. Sept. 25, 2017) .............................................................7

*Henderson v.Cmty. Bank (In re Stinson Petroleum Co.)*, Nos. 09-51663-NPO, 09-05094-NPO, 2011 Bankr. LEXIS 3511 (Bankr. S.D. Miss. Sept. 14, 2011) .......27

*Hollis Park Manor Nursing Home v. Landmark Am. Ins. Co.*, 803 F. Supp. 2d 205 (E.D.N.Y. 2011)................................................................................... 23, 30

*Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42 (2d Cir. 2018) .....................13

*In re Checking Account Overdraft Litig.*, 286 F.R.D. 645 (S.D. Fla. 2012) .... 40, 41

*In re Currency Conversion Fee Antitrust Litig.*, 773 F.Supp.2d 351 .....................21

*In re IPO Secs. Litig.*, 471 F.3d ...........................................................................14

*In re Petrobras Sec. Litig.*, 862 F.3d 250 (2d Cir. 2017).......................................14

*Int'l Fidelity Ins. Co. v. Cnty. of Rockland*, 98 F. Supp. 2d 400 (S.D.N.Y. 2000)..28

*Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432 WL 5394192 (1st Cir. 2013) ........................................................................................................32

*L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110 (2d Cir. 2020).....................................13

*LeVan v. Indep. Mall*, No. 06A-05-006 MMJ, 2007 Del. Super. LEXIS 63 (Super. Ct. Feb. 28, 2007) ....................................................................27

*Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1 (2d Cir. 2017) ........................................................................ 5, 16, 31

*Massey-Harris Harvester Co. v. Fed. Reserve Bank*, 226 Mo. App. 916, 48 S.W.2d 158 (1932) ...................................................................27

*McCabe v. Lifetime Entm't Servs., LLC*, 761 F. App'x 38 (2d Cir. 2019) ...............13

*Pettibone v. WB Music Corp.*, 767 F. App'x 145 (2d Cir. 2019) ...........................35

*Rank Grp. Ltd. v. Alcoa Inc.*, No. 12-CV-3769, 2018 WL 1388516 (S.D.N.Y. Mar. 19, 2018) ....................................................................28

*Red Barn Motors, Inc. v. Nextgear Capital, Inc.*, 915 F.3d 1098 (7th Cir. 2019)..32, 39

*Roach v. Morse*, 440 F.3d 53 (2d Cir. 2006) ...........................................13

*Robin Drug Co. v. Pharmacare Mgmt. Servs.*, No. 03-3397(PAM/RLE), 2004 U.S. Dist. LEXIS 8618 (D. Minn. May 13, 2004) .....................................33

*Salvatora v. Xto Energy Inc.*, No. 2:19-CV-01097-CRE-NR, 2023 U.S. Dist. LEXIS 96311 (W.D. Pa. June 2, 2023) ...............................................38

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982) ................................................................ 16, 30, 32

*Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234 (2d Cir. 2011) ................... 14, 42

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107 (2d Cir. 2006) ........................................................................35

*Thomas v. Jordan*, 116 N.Y.S. 3d 486 (N.Y. App. Term. 2020) ...........................35

*Turner v. GMAC*, 980 F. Supp. 737 ................................................ 17, 18

*U.S. Automobile Ass'n. v. Wells Fargo*, 2:18-cv-00245-JRG, 2019 WL 2488135 (E.D. Tex. Jun. 13, 2019).....................................................27

## Statutes

12 C.F.R. § 1005.4 ............................................................ 7, 14, 17

12 C.F.R. § 1030 ....................................................................29

12 U.S.C.S. § 4002.................................................................28

15 U.S.C. § 1693 ............................................................. passim

## Treatises

Michie on Banks and Banking (2020) ....................................................27

## I.    INTRODUCTION

HSBC Bank USA, N.A. ("HSBC") promises its Direct Savings account customers that "[i]nterest begins to accrue on the Business Day you deposit noncash items (*e.g.*, checks)."

Despite this straightforward contract language, HSBC treats non-cash items other than checks, such as ACH deposits, less favorably when it comes to accrual of interest.  Specifically, whereas it is undisputed that HSBC deems checks to be deposited when presented to the bank (*e.g.* over the teller line), HSBC deems ACH transfers to be deposited not when it receives the same information as appears on a traditional check (the payor, payee, the account number, the routing number and the amount), but rather only when it has "fully and finally received" the funds. Using this approach, which is not disclosed anywhere in the contractual documents upon which Appellant's claim hinges, HSBC does not apply interest with regard to ACH deposits until several business days after a customer makes his or her deposit.  In effect, HSBC maintains that when it promises accountholders that it will start accruing interest on the "day you deposit noncash items (*e.g.* checks)" it is actually informing the accountholder that it will start accruing interest "the day you deposit the noncash item if your noncash items is a check, but the day we [HSBC] receive the funds if your noncash item is an ACH."

Appellant made two ACH transfers into his HSBC account using HSBC's web portal, each for $100,000. In each instance, Appellant's deposit did not accrue interest on the date of deposit but rather some days later.

Appellant filed this lawsuit on behalf of himself and similarly situated HSBC customers, asserting claims for breach of contract and for violation of the Electronic Funds Transfer Act and New York General Business Law § 349.

In a series of rulings, the district court:

a. Dismissed Appellant's claim under the EFTA on the pleadings, holding that the contractual provisions regarding when interest would accrue on electronic funds transfers were not "terms and conditions" for purposes of § 1693c(a), and that the interest that HSBC promised but failed to accrue on each transfer was neither a "charge" nor a "fee" for purposes of § 1693c(a)(4);

b. Held that the meaning of the phrase "[i]nterest begins to accrue on the Business Day you deposit noncash items (*e.g.*, checks)" was ambiguous; and

c. Held that evidence of Appellant's subjective understanding at the time of his pre-litigation telephone disputes with HSBC, six months after account opening, of how interest accrual worked was highly relevant extrinsic evidence that precluded class certification.

As limited by the district court's discovery rulings (which are not on appeal), the case involves failure to accrue interest starting on the date of deposit with regard to approximately 392,198 ACH deposits, involving approximately 144,699 unique consumer accounts. A-121.[1]

With regard to the EFTA, the district court's holding that "the loss of the opportunity to earn interest is not a term or condition of an electronic fund transfer that must be disclosed in 'clear and readily understandable' language" but "[r]ather. . . . an 'obvious opportunity cost inherent in the concept of a deposit'" runs afoul of the plain language of the statute, the implementing regulation, and the accepted meaning of the phrase "terms and conditions", as well as the purpose of the EFTA. The Court's holding that the interest promised to Appellant but not paid to him constitutes neither an undisclosed "fee" nor "charge" is contrary to the well-reasoned decision in *Berenson v. Nat'l Fin. Servs.*, LLC, 403 F. Supp. 2d 133 (D. Mass. 2005) – the only other decision to address this issue – and is likewise reversible error.

---

[1] The district court issued a series of discovery rulings that effectively barred inclusion of claims involving deposits that were initiated from the web portals of any bank other than HSBC, effectively halving the size of the class. Those discovery rulings are not on appeal. It is undisputed that Appellant initiated his deposits on HSBC's web portal. HSBC knows the amounts for ACH deposits initiated through its website at the time of initiation, as with Appellant's transactions. A-98. HSBC acknowledges that at least 88,000 Direct Savings Accounts are at issue in this litigation. A-89. The data Appellant obtained through discovery shows that there are at least 144,699 accounts at issue. A-121.

The district court's holding that the provision in HSBC's standardized form agreement stating "[i]nterest begins to accrue on the Business Day you deposit noncash items (*e.g.*, checks)" is ambiguous was likewise erroneous. Particularly in light of HSBC's decision to list checks as the exemplar of how it would treat deposits, there is no reasonable basis to read the "day you deposit noncash items (*e.g.* checks)" as meaning "the day you deposit the noncash item if your non-cash items is a check, but the day we [HSBC] receive the funds if your noncash item is an ACH."

Moreover, even if the term "day you deposit" might somehow be held to mean "the day we receive the funds" (notwithstanding, *inter alia*, HSBC's chosen example of checks – regarding which it is undisputed that the date of deposit is not synonymous with the date of receipt of funds), the district court erred in ruling that Appellant's subjective understanding of how interest accrual was supposed to work was relevant to the Court's interpretation of the contract.

The district court's ruling runs afoul of binding precedent in this Circuit, sister circuits, and the Restatement (Second) of Contracts, § 211 (Standardized Agreements), all of which provide that standardized form contracts are to be given uniform meaning without regard to the subjective intent of the parties and that interpretation of adhesion contracts is a question of law, not fact.

Indeed, this Circuit has "expressed a particular distaste for interpreting boilerplate indenture provisions based on the "relationship of particular borrowers and lenders" or the "particularized intentions of the parties to an indenture," both of which undermine "uniformity in interpretation." *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 15 (2d Cir. 2017).

Finally, the district court's denial of class certification, which was premised on its mistaken belief that extrinsic evidence of subjective intent would be the central issue at trial, was premised on an error of law and therefore also reversible error.

## II.    JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332(d), and 15 U.S.C. § 1693m. The court entered final judgment for HSBC on September 25, 2023. The plaintiff timely appealed on October 16, 2023. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## III.    STATEMENT OF THE ISSUES

1.  Did the district court err in holding that the contractual provisions regarding accrual of interest on electronic funds transfers in HSBC's accountholder agreement were not "terms and conditions of electronic fund transfers involving a consumer's account" and were therefore not required to be "disclosed at the time the consumer contracts for an electronic fund transfer

service" (§ 1693c(a)) and to be "be clear and readily understandable". 12 CFR § 1005.4?

2. Did the district court err in holding that the contractual language at issue, "[i]nterest begins to accrue on the Business Day you deposit noncash items (*e.g.*, checks)" was ambiguous as applied to noncash items other than checks, such that a check would accrue interest on the date provided to a teller even though HSBC does not receive the funds on that day but ACH deposits would accrue interest on the date the funds were actually received by the Bank, rather than the date on which the same information as appears on a check was provided to HSBC?

3. Did the district court err in holding that Appellant's subjective understanding of the bank's form contract as expressed on a pre-litigation phone call disputing his monthly statement was extrinsic evidence to be considered by the jury as to the objective meaning of HSBC's accountholder agreement and, if so, that consideration of such evidence precluded class certification on grounds of adequacy?

## IV.   STATEMENT OF THE CASE

### A. Statutory And Regulatory Background

The EFTA was enacted to "provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and

remittance transfer systems." 15 U.S.C. § 1693. Its "primary objective" is "the provision of individual consumer rights." *Id.*

The EFTA, like other consumer statutes, is to be construed liberally in order to achieve its remedial and protective purpose. *See Avila v. Riexinger & Assocs., LLC*, 817 F.3d 72, 75 (2d Cir. 2016) ("consumer protection statute[s]" must be construed "in liberal fashion [to achieve] the underlying Congressional purpose."); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2017 WL 4274196, at *3 (D. Nev. Sept. 25, 2017) ("The EFTA is a "remedial statute accorded a broad, liberal construction in favor of the consumer.").

The EFTA and its implementing regulations require financial institutions like HSBC to disclose the terms and conditions of electronic fund transfers in "clear and readily understandable" language. 12 C.F.R. § 1005.4(a)(1); 15 U.S.C. § 1693c(a).

### B. The District Court's Decisions At Issue On This Appeal

By Order dated January 5, 2021, the Court dismissed Appellant's EFTA claims on the pleadings and denied dismissal of his breach of contract claim and GBL 349 claim. A-26 – A-35.

In doing so, the Court held that the contractual provision at issue was not part of the "terms and conditions" of an electronic funds transfer for purposes of the EFTA and thus did not need to be disclosed in clear and readily understood

language to accountholders under 1693c(a); that interest accrued between the date of deposit and the date of receipt of funds, that was promised to consumers but not paid to them did not constitute a "charge" or "fee" required to be disclosed under the EFTA under 1693c(a)(4); that the relevant contractual provision was ambiguous; and that "extrinsic evidence that is not before me may shed light on the parties' actual intent" and further held that the EFTA's disclosure requirements did not apply.

By Order dated June 22, 2023, the Court issued a summary judgment order that is unusual in that it cited no case law and contained no specific cites to the voluminous record. The Court denied summary judgment, but centered its analysis on the Court's assessment of the audio of Appellant's pre-litigation call and what it might have reflected about Appellant's subjective understanding of his accountholder agreement as of the time of that call, some six months after Appellant opened his account. The Court viewed the audio as ambiguous but as providing support for the view that "plaintiff's understanding at that point [*i.e.* in November 2019] was that interest would not begin to accrue until HSBC had cleared funds in hand." A-133.

The Court also suggested that HSBC's position was strengthened by Appellant's deposition testimony, "one reading" of which was that Appellant only "skimmed the contract before he entered into it, [and] did not read it in detail until

after the November 2019 call when he thought HSBC was not accruing interest despite his (mistaken) belief that it had received the funds." A-134. The Court went on to state that "plaintiff's subjective understanding . . . . presents an issue of fact regardless of how closely plaintiff read the contract before entering into it." A-136.

Finally, the Court held that HSBC's internal communications, although never disclosed to Plaintiff "may be no less admissible [at trial] than plaintiff's testimony that he thought interest accrued at initiation based on his dealings with other banks." A-136.

By Order dated September 12, 2023, the Court denied class certification because Plaintiff's statements on the November 2019 phone calls rendered him an inadequate class representative:

> Plaintiff faces serious obstacles to recovery on his individual claims. The statements he made in his 2019 phone calls are compelling evidence that he understood that, just as HSBC claims, he would not begin accruing interest until HSBC had his cash on hand. He repeatedly expressed concerns about HSBC failing to post his deposit to his account when he believed they had his money on hand, but never expressed his supposed belief that interest should have started to accrue as soon as he initiated the deposit, regardless of whether HSBC had the cash on hand. Since plaintiff now seeks to establish that he was misled to believe (and in fact believed) that interest would begin accruing as soon as he initiated a deposit, he faces an uphill battle on a core element of his claims. Plaintiff's path to recovery is therefore obstructed by a key problem that other members of the prospective class do not share. ***With his understanding of the key terms being the central issue in this case,*** that makes him an inadequate representative. See *Cohen v. Laiti*, 98 F.R.D. 581 (E.D.N.Y. 1983).

A-144 (emphasis added).

Plaintiff subsequently conceded that the amount in controversy on his individual claims did not exceed $75,000.  A-112.

The Court then dismissed the case for lack of subject matter jurisdiction.  A-147.

This appeal followed.  A-148 – A-150.

## V.    FACTUAL BACKGROUND

### A. HSBC Promises That Interest On Its Direct Savings Accounts Begins To Accrue The Same Business Day Customers Deposit Noncash Items

HSBC offered a savings account product called HSBC Direct Savings that it claimed earned interest at a rate 20 times better than the national average.  A-114 – A-116.

In its Rules for Consumer Deposit Accounts, HSBC says, "Interest rates, compounding periods, balance computation methods, and minimum balance requirements are explained in the *Terms and Charges Disclosures*."  A-57 – A-58. The HSBC Direct Savings Terms and Charges Disclosure states that "Interest begins to accrue on the Business Day you deposit noncash items (*e.g.*, checks)." A-77.  "Business Day" is defined as "every day except Saturday, Sunday and Federal holidays."  A-78.  There are no other contractual provisions addressing the accrual of interest for ACH transfers.

It is undisputed that, with regard to checks, the one type of noncash item specified ("*e.g.* checks"), HSBC's position is that the deposit occurs when the check is provided to the bank.  *See*, https://www.us.hsbc.com/mobile-banking/faq/ ("When will my funds be available? Checks deposited before 10pm ET on a business day will have that day as the day of deposit."). A-129.

## B. HSBC Did Not Apply Interest To Plaintiff's Deposits On The Same Business Day They Were Made

Plaintiff opened a Direct Savings account with HSBC Bank in May of 2019. On Friday, May 31, 2019, Plaintiff made a $100,000 deposit by ACH transfer. Using HSBC's web portal, Plaintiff provided the routing and account numbers for the non-HSBC bank account, and the transfer amount.  A-85.

It is undisputed that HSBC only credited Plaintiff's account for interest accrued beginning on Tuesday, June 4, 2019, two business days after the deposit. A-97.  On Tuesday, November 26, 2019, Plaintiff made a second deposit of $100,000 to his HSBC account by ACH transfer.  A-85.

Specifically, using HSBC's own web portal, Plaintiff provided the account number for the non-HSBC bank account, as well as the routing number and amount to be transferred.  HSBC credited Plaintiff's account for interest accrued starting on Friday, November 29, 2019, two business days after the deposit.  A-86.

### C. Appellant's Calls To HSBC

Following the November transfer, Appellant was contacted by HSBC's fraud department to verify that transfer, checked his account, and called HSBC to find out why the funds had not yet posted.

During the subsequent November and December 2019 conversations, Mr. Cheng – who believed incorrectly that HSBC had already received his funds at the time the fraud department had called on November 26 – engaged in a series of phone conversations with HSBC about why interest was not accruing. Informed that the transfer would not post for three to five business days, Mr. Cheng complained over the phone that in his experience bank transfers should only take one business day; expressed his belief that bank already had his money and that the transfers generally occurred in a single day via a clearinghouse, and argued that interest should start accruing the business day after the deposit regardless of when the transaction posted because "HSBC have my money [*sic*] since November 26". A-104-105.

Appellant filed suit on March 25, 2020. A-14.

Appellant filed his amended complaint on January 13, 2021. A-82.

### VI. STANDARD OF REVIEW

This Court reviews a grant of dismissal on the pleadings *de novo*. *McCabe v. Lifetime Entm't Servs., LLC*, 761 F. App'x 38, 40 (2d Cir. 2019) ("We review de

novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.") (citations omitted).

This Court "review[s] a grant of summary judgment *de novo*, examining the evidence in the light most favorable to, and drawing all inferences in favor of, the non-movant." *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 50 (2d Cir. 2018).

This Court "review[s] questions of statutory interpretation *de novo*." *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006). *L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 114 (2d Cir. 2020).

This Court reviews "a district court's conclusions as to whether the requirements of Federal Rule of Civil Procedure 23 were met, and in turn whether class certification was appropriate, for abuse of discretion." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 260-61 (2d Cir. 2017).

However, this Court is "noticeably less deferential . . . when [the district] court has denied class status than when it has certified a class." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999) (internal quotation marks omitted), *overruled on other grounds by In re IPO Secs. Litig.*, 471 F.3d at 40.

"A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." *Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 250-51 (2d Cir. 2011) (citations omitted).

## VII.   SUMMARY OF ARGUMENT

1. The district court erred when it held that contractual provisions explaining how interest would accrue on electronic funds transfers were not "terms and conditions of electronic fund transfers" required to be disclosed in a manner that was "clear and readily understandable" under the EFTA.  15 U.S.C. § 1693(c)(a); 12 C.F.R. § 1005.4.  The district court's ruling was contrary to the plain language of the statute, the purpose of the EFTA and the common meaning of the phrase "terms and conditions".

2. The district court erred when it held, contrary to the persuasive analysis in *Berenson v. Nat'l Fin. Servs.*, LLC, 403 F. Supp. 2d 133 (D. Mass. 2005), that interest accrued between the date of deposit and the date of receipt of funds that was promised to consumers but never paid to them was not a "fee" or "charge" under 15 U.S.C. § 1693c(a)(4).

3. The district court erred when it held that the statement in HSBC's standardized form agreement stating " [i]nterest begins to accrue on the Business Day you deposit noncash items (*e.g.*, checks)" is ambiguous such that it could be reasonably understood to mean  that interest would accrue "on the Business Day you deposit the noncash item if your non-cash items is a check, but the day we [HSBC] receive the funds if your noncash item is an ACH."  Particularly because HSBC provided checks as the example to accountholders of a noncash item, and because it is undisputed that the date of deposit for a check is the date it is presented to HSBC, HSBC's proposed reading is unreasonable.

4. The district court erred in finding that the supposed ambiguity in HSBC's standardized form contract should be resolved at trial by reference to extrinsic evidence of Appellant's subjective understanding of how accrual was supposed to work as expressed in a pre-litigation call to HSBC in November 2019.  This holding was contrary, *inter alia*, to this Circuit's prior precedents – *e.g. Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982) ("Boilerplate provisions are . . . not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture. There are no adjudicative facts relating to the parties to the litigation for a

jury to find and the meaning of boilerplate provision is, therefore, a matter of law rather than fact."); *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 15 (2d Cir. 2017) ("we have expressed a particular distaste for interpreting boilerplate indenture provisions based on the "relationship of particular borrowers and lenders" or the "particularized intentions of the parties to an indenture," both of which undermine "uniformity in interpretation.") – the rulings of our Sister Circuits and the Restatement (Second) of Contracts, § 211.

## VIII.  ARGUMENT

### A. Terms And Conditions Relating To Accrual Of Interest Are Not Exempt From The EFTA's Disclosure Rules

Appellant alleges that HSBC violated the EFTA's requirement to clearly and conspicuously disclose all terms and conditions of electronic funds transfers.

Specifically, 15 U.S. Code § 1693c (Terms and conditions of transfers), states in subsection (a) that "terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed at the time the consumer contracts for an electronic fund transfer service, in accordance with regulations of the Bureau."  Regulation E, in turn, states that "Disclosures required under this part shall be clear and readily understandable,".  12 C.F.R. § 1005.4

As set forth above, the Court allowed Plaintiff's breach of contract claim to proceed, finding that the meaning of the provision stating that "[i]nterest begins to

accrue on the Business Day you deposit non-cash items" was ambiguous. A-28. In doing so, the Court noted that "the relevant contractual provision does not contain any mention of when the bank receives the credit for the non-cash item. Instead, it plainly states that interest accrues on the day 'you deposit' the non-cash item." A-29.

Nonetheless, the district court dismissed Appellant's 1693c(a) claim on grounds that "the loss of the opportunity to earn interest is not a term or condition of an electronic fund transfer that must be disclosed in 'clear and readily understandable' language. Rather, continued the district court, it is an 'obvious opportunity cost inherent in the concept of a deposit". A-33, quoting *Turner v. GMAC*, 980 F. Supp. 737, 742.

This conclusion was erroneous. As an initial matter, contractual terms relating to when interest will begin to accrue on deposits made via electronic funds transfer fall within the plain meaning of "terms and conditions of electronic funds transfers". See, *e.g.* https://www.merriam-webster.com/dictionary/terms (The plain English meaning of the word "terms" in this context means "provisions that determine the nature and scope of an agreement"; Black's Law Dictionary (11th ed. 2019) (CONDITION, "3. Loosely, a term, provision, or clause in a contract.) (CONTRACT TERM. . . "A contractual stipulation <the delivery term provided for shipment within 30 days>. — Also termed *contract term.*")

Having denied the motion for judgment on the pleadings and the motion for summary judgment on Appellant's claim that HSBC breached its contractual promise to accrue interest on electronic funds transfers starting on the date of deposit on grounds that the provision was ambiguous, it follows that its disclosure was not "clear and readily understandable" on that point.[2]

There is no support in the EFTA, Regulation E, the case law, or the English language for the district court's creation of a new category of contractual provisions that are applicable to electronic funds transfers but exempt from the EFTA's disclosure requirements because they are related to accrual of interest and therefore somehow neither "terms" nor "conditions" but rather "opportunity costs".

*Turner v. GMAC*, 980 F. Supp. 737, 742, cited by the district court, and the source of the "opportunity cost" language in the district court's decision, is not contrary to this conclusion and has nothing to do with the EFTA or the case at bar more generally: In *Turner*, the plaintiff paid the defendant a refundable security deposit as part of the consumer's lease with defendant. The lease stated, in relevant part, "We will not pay you interest on the security deposit." GMAC placed the funds in a non-interest-bearing account in accordance with New York law.

---

[2] Appellant's EFTA claim does not, however, hinge on the language in the contract being unambiguous. By clearly stating that interest would be accrued on the date of deposit and then failing to do so and instead accruing interest only on the date of receipt of funds HSBC rendered the disclosure inaccurate.

However, GMAC did earn "earnings credits" from Chase which it could use to offset other financing charges it might incur. The consumer complained that the earnings credit received by the lessor from its bank in connection with the security deposit was a fee or charge that was required to be disclosed to the consumer under the Consumer Lease Act. *Id.* at 452-53.

Notably, the CLA's implementing regulations excluded refundable security deposits from the definition of "other charges" and required disclosure only of charges "payable by the lessee" (consistent with Congress' stated focus on limiting liability to only "disclosures which are of material importance in credit shopping"). *Id*. at 455-7.

The *Turner* court rejected this claim on various grounds, not least being that the funds were not "payable by the lessee" and were therefore obviously outside the CLA's definition of "fees and charges", stating: "Although plaintiff loses the opportunity to earn interest and receive other benefits from his own bank when he transfers the security deposit to defendant, this is an obvious opportunity cost inherent in the concept of a deposit. Inherent costs of this nature are not "other charges payable by the lessee" that must be disclosed under the CLA."

None of these factors apply, even by analogy, to the case at bar, or to the EFTA more generally. *Turner* simply has no application here. To wit, whether credits earned by the lessor on a consumer's refundable security deposit when it

19

puts that deposit in its own bank is a fee or charge under the CLA tells us nothing about whether the rules for interest accrual on electronic fund transfers are "terms or conditions" under the EFTA. Indeed, *Turner* is inapposite even with regard to the meaning of the term "fee" or "charge" – which appears in both the CLA and the EFTA – because the earnings credit at issue in *Turner* was not money promised to the consumer under the contract at all, but rather a value the lessor was receiving from its own bank in connection with keeping the consumer's security deposit with that bank.

## B. Accrued Interest Owing To A Consumer But Not Credited To The Consumer's Account Constitutes A Charge Under The EFTA.

Section 1693c(a)(4) required HSBC to disclose "any charges for electronic fund transfers or for the right to make such transfers."

Appellant alleges that HSBC's policy of promising to accrue interest on the date of deposit but waiting until the date that the ACH funds are received constitutes an undisclosed charge. See, *e.g.* A-92.

The District Court dismissed Appellant's claim under this subprovision on grounds that the bank's retention of interest that had accrued on the account but was not credited to the account was outside the ordinary meaning of the term "fee" or "charge".

> The ordinary meaning of a "fee" or "charge" is a debit for some specific amount that is due or owing in connection with a service. See Black's Law Dictionary (11th ed. 2019) (defining "fee" as a "charge

or payment for labor or services"; "charge" as a "[p]rice, cost, or expense"; and "debit" as a "sum charged as due or owing"); Merriam-Webster Dictionary (defining "fee" as "a fixed charge" or "a sum paid or charged for a service"; and "charge" as "the price demanded for something" or "a debit to an account")

A-32.

This was erroneous.

As an initial matter, common usage and dictionary definitions of the relevant terms are broader than indicated by the district court. Common usage of the term "fee" (such as a realtor's "fee", a broker's "fee", referral "fee", balance transfer "fee", etc.) regularly references obligations calculated on a percentage basis. *See, e.g.*, *Deutsche Bank Secs., Inc. v. Rhodes*, 578 F.Supp.2d 652 (S.D.N.Y. 2008) (discussing fee that provides a "percentage formula for payment of part of fee"); *see also In re Currency Conversion Fee Antitrust Litig.*, 773 F.Supp.2d 351, 632 (discussing percentage fee charged by Bank of America).

Moreover, the Merriam definition of "charge" (which is the term used in the EFTA itself), which includes, *inter alia*, "to fix or ask as fee or payment", "to impose a financial burden on", "to impose or record as financial obligation". Likewise, the American Heritage Dictionary which refers to the word "charge" to mean, *inter alia*, ". . . [a] financial burden, such as a tax or lien"); *see also*, *Berenson* 403 F. Supp. 2d at 150 (finding that unaccrued interest was a charge consistent with, *inter alia*, Black's Law Dictionary).

A simple hypothetical is instructive: If the bank had stated in its contract that, "All ACH transfers are subject to a transfer fee equal to two days of interest on the amount transferred at the rate applicable to deposits made into the account" could anyone seriously contend that the interest retained by the bank was not a charge, or that the word "fee" as used in that provision was somehow odd or out of place? Of course not. EFTA liability under § 1643(c)(a)(4) is appropriate because HSBC has imposed precisely such a charge on its customers but has opted not to disclose it.

The only case to have addressed the issue of whether accrued interest not credited to a consumer's account constituted a charge under the EFTA held that it did: In *Berenson v. Nat'l Fin. Servs.*, LLC, 403 F. Supp. 2d 133 (D. Mass. 2005), the plaintiffs initiated a transfer of funds out of their account using the defendant's electronic "BillPay" service. *Id*. at 140. The defendant retained the funds between the transaction date and the date of transfer but did not apply interest to the plaintiffs' account during that period. *Id*. at 150. In finding that this lost interest constituted a charge under the EFTA that was required to be disclosed, the Court noted that a broad reading of the term "charge" is consistent with "the very purpose of, and reason for, the Act—the protection of customers from the unauthorized or improper use of funds." *Id*.

Accordingly, the court concluded that "[e]ven if the agreements made it clear that several days would transpire between the withdrawal of funds from a customer's account and receipt of those funds by the intended payee, Fidelity failed to disclose this interim loss of interest as a fee, as required by the [EFTA]." *Id*. at 151.

Indeed, judicial creation of a rule exempting interest or percentage-based charges from EFTA coverage risks effectively gutting the EFTA's fee disclosure requirements, as virtually any charge could simply be calculated on a percentage of funds basis and subtracted from interest that would otherwise have accrued. *See Berenson*, 403 F. Supp. 2d at 150 (defining "charges" to include a "loss of interest" in connection with an electronic transfer is consistent "with the very purpose of, and reason for, the Act.").

As was the case in *Berenson*, the interest HSBC fails to apply is a "charge" within the meaning of the EFTA. The district court erred in finding to the contrary.

## C. The Terms Of The Contract Are Not Ambiguous

As this Court explained in *Hollis Park Manor Nursing Home v. Landmark Am. Ins. Co.*, 803 F. Supp. 2d 205 (E.D.N.Y. 2011):

> "Whether a contract is ambiguous is a question of law and extrinsic evidence may not be considered unless the document itself is ambiguous." *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528, 868 N.E.2d 956, 837 N.Y.S.2d 600. "[T]he court should not find the contract

ambiguous where the interpretation urged by one party would strain [
] the contract language beyond its reasonable and ordinary meaning."
*Law Debenture Trust Co.*, 595 F.3d at 467 (second alteration in
original).

*Id*. at 207.

This Court further stated in *Cox v. Spirit Airlines, Inc.*, 786 F. App'x 283,

286 (2d Cir. 2019) as follows:

"An ambiguity exists where the terms of the contract could suggest
more than one meaning when viewed objectively by a reasonably
intelligent person . . . who is cognizant of the customs, practices,
usages and terminology as generally understood in the particular trade
or business." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted).
By contrast, a contractual term is unambiguous if it has "a definite and
precise meaning, unattended by danger of misconception . . . , and
concerning which there is no reasonable basis for a difference of
opinion." *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355, 385 N.E.2d
1280, 413 N.Y.S.2d 352 (1978).

. . . "A contract has, strictly speaking, nothing to do with the personal,
or individual, intent of the parties." *Hotchkiss v. Nat'l City Bank of
N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911) (Hand, *J*.). It is "the reasonable
meaning" of the parties' words or conduct that govern.

*Id.* at 294.

The district court here began its analysis by correctly noting that HSBC's

disclosure failed to reference the date of receipt of funds, completion of the

transaction or the like:

The Disclosures state that "[i]nterest begins to accrue on the Business
Day *you*" – the account owner – "deposit noncash items." (Emphasis
added.). The agreement does not state that interest accrues only once
the transaction is complete, or once the bank receives the funds, or

once the funds are credited to the account, or otherwise suggest that interest accrual relates to some act performed by the bank or during the transfer. Instead, the Disclosures tie the date of interest accrual to the act taken by "you," *i.e.*, the account owner. A-28.

While HSBC pointed below to language in the Electronic Balance Transfer Service ("EBTS") the district court correctly noted he "EBTS is a separate agreement and provides little support for defendant's interpretation."  A-28. Specifically, the district court observed:

> "The EBTS states that an electronic transfer may take up to four days "before it is *credited* to your" account. It does not state that a *deposit* may take up to four days to be completed, or consummated, or recognized by the bank. And it certainly does not state that interest will not accrue until the Business Day that noncash items are credited to the account.

The Court likewise correctly observed that *Eke v. Bank of Am., N.A.,* No. 09-cv-488, 2009 WL 10688932, at *2 (E.D. Va. Nov. 12, 2009), did not support HSBC's position (inasmuch as that case dealt with a disclosure that stated that "interest begins to accrue no later than the business day on which [BOA] receive[s] credit for non-cash items, such as checks.") but rather "somewhat supports plaintiff's position."  A-29.  "Here, however" the district court continued, "the relevant contractual provision does not contain any mention of when the bank *receives* credit for the non-cash item. Instead, it plainly states that interest accrues on the day "you deposit" the non-cash item." *Id.*

Despite its own devastating critique of HSBC's position, the district court nonetheless held that "Plaintiff's proposed interpretation is not any less ambiguous".

The district court's analysis in support of that conclusion was as follows:

> Plaintiff's cited cases focus on check deposits and ATM transfers, not ACH transfers, and so are not persuasive. As used in this context, it is not an unreasonable interpretation of word "deposit" as referring to the act of placing money in the custody of the bank, and not merely the act of requesting an ACH transfer. See *United States v. Jenkins*, 943 F.2d 167, 174 (2d Cir. 1991) ("the term 'deposit' means a sum of money placed in the custody of a bank") (citing Black's Law Dictionary 395 (5th ed. 1979)). There can be a reasonable difference in opinion as to whether the date "you deposit" funds refers to the date an account holder requests a transfer of funds or the date the bank receives the funds, and thus the provision is ambiguous.

A-30.

This analysis was erroneous. First, Plaintiff's focus on check deposits was appropriate because HSBC identified checks as its example of a non-cash item that would accrue interest starting on the date of deposit. A-77.

Moreover, *Jenkins*, relied upon by the district court, is inapposite because it involved the question of whether a criminal defendant had violated the Glass-Steagall Act's prohibition on unlicensed "receiving [of] deposits subject to . . . repayment" when the defendant accepted cash during a sting operation. In this context, the Court's observation that a deposit is commonly understood to mean a sum of money placed in the custody of a bank sheds no light on whether non-cash items are only deemed deposited after the bank receives the funds.

There is no support in the record or *Jenkins* for the view that "date of deposit" means date of receipt of funds as applied to non-cash items. Indeed, *Michie on Banks and Banking* cited in *Jenkins* states that "the word "deposit", as "ordinarily used" in the banking business, means the placing of money, **checks, and the like** with a bank.", citing 5A *Michie on Banks and Banking*, Ch. 9, § 3, at 4 (2020) (emphasis added).

Indeed, for over 80 years, courts have consistently interpreted "date of deposit" and similar phrases to mean the date on which the bank was presented with a check (not the date on which a check cleared, settled, credited to an account, etc.). *See, e.g.*, *Berkley Risk Adm'rs Co., LLC v. Wells Fargo Bank*, No. 06-2804 (PAM/JSM), 2008 U.S. Dist. LEXIS 132548, at *15 (D. Minn. Jan. 7, 2008) (using the term "date of deposit" to mean the date on which "checks were deposited across a teller line"); *U.S. Automobile Ass'n. v. Wells Fargo*, 2:18-cv-00245-JRG, 2019 WL 2488135, at *8 (E.D. Tex. Jun. 13, 2019) ("depositing a check" means "providing a check to a depository in a form sufficient to allow money to be credited to an account"); *Henderson v.Cmty. Bank (In re Stinson Petroleum Co.)*, Nos. 09-51663-NPO, 09-05094-NPO, 2011 Bankr. LEXIS 3511, at *6-7 (Bankr. S.D. Miss. Sept. 14, 2011) (distinguishing between the "date of deposit" and the date of presentment for payment through the Federal Reserve); *Massey-Harris Harvester Co. v. Fed. Reserve Bank*, 226 Mo. App. 916, 923, 48 S.W.2d 158, 161

(1932) (same); *LeVan v. Indep. Mall*, No. 06A-05-006 MMJ, 2007 Del. Super. LEXIS 63, at *8 (Super. Ct. Feb. 28, 2007) (discussing the "date of deposit" vs. the day the person who makes the deposit "receives money for the negotiated instrument".)

Likewise, the "date of deposit" for ATM deposits is distinguished from the date non-cash items are credited or available for withdrawal. *See, e.g.*, 12 U.S.C.S. § 4002(c)(1) & (2); *See Credit Union Nat'l Asso. v. Bd. of Governors of Fed. Reserve Sys.*, 700 F. Supp. 1152, 1155 (D.D.C. 1988).

Indeed, the insistence that HSBC's use of the term "deposit" in the Disclosure really means "credited" makes the term "deposit" superfluous. *See Rank Grp. Ltd. v. Alcoa Inc.*, No. 12-CV-3769, 2018 WL 1388516, at *18 (S.D.N.Y. Mar. 19, 2018) ("[I]t is a basic principle of contract interpretation that a contract should be, if possible, interpreted to give meaning to every provision."); *see also* 11 Samuel Williston, Williston on Contracts § 32.5 (4th ed.) ("To the extent possible … every word, phrase or term of a contract must be given effect."). HSBC's reading of the interest provision would read the word "deposit" out altogether, and the Court must give effect to HSBC's decision to use the term deposit instead of credit as the predicate for the accrual of interest. *See Int'l Fidelity Ins. Co. v. Cnty. of Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000) ("Sophisticated lawyers, such as those drafting standard forms … must be

presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning.").

Notably, the Truth in Savings Model Clauses and Sample Forms (Appendix B to 12 C.F.R. § 1030) recognizes that while banks may choose to wait until they receive credit for an ACH transfer before accruing interest, they do not have to. Banks can instead opt for the more consumer-favorable "date of deposit" approach like HSBC did. Accordingly, there are model clauses for both practices. Given its desire to wait until credit is received, HSBC used the wrong model clause language. HSBC is now in the position of having promised to accrue interest in a way that is favorable to consumers while actually accruing it in a different way that, although not unlawful, is contrary to its promise and less favorable to its customers. A-107 – A-108.[3]

Taking all of the foregoing into account, it is simply implausible to read the "day you deposit noncash items (*e.g.* checks)" as informing the accountholder that HSBC will start accruing interest "the day you deposit the noncash item if your

---

[3] HSBC alone of the top 15 banks uses the second model clause without any additional explanation. A-108 – A-109. "[W]here language has a generally prevailing meaning, it is interpreted in accordance with that meaning." Restatement (Second) of Contracts § 202(3)(a); *see also Wasilkowski v. Amsterdam Mem. Hosp.*, 486 N.Y.S.2d 800, 802 (N.Y. App. Div. 1985) (citing § 202(3)(a) in finding the trial court "properly interpreted [the disputed terms] in accordance with the prevailing meaning of the language used").

noncash items is a check, but the day we [HSBC] receive the funds if your noncash item is an ACH."

Rather, HSBC's proposed reading would "strain the contract language beyond its reasonable and ordinary meaning." *Hollis Park Manor Nursing Home v. Landmark Am. Ins. Co.*, 803 F. Supp. 2d 205, 207 (E.D.N.Y. 2011) *(quotations omitted).* For this reason, the district court's finding of contractual ambiguity was reversible error.

### D. Even If HSBC's Form Contract Were Deemed To Be Ambiguous, That Ambiguity Must Be Resolved Without Regard To Individual Accountholder's Subjective Understandings.

1. Consistent With This Court's Precedents, Sister Circuits And The Restatement (Second) of Contracts, Extrinsic Evidence Of Individual Accountholders' Subjective Intent Is Irrelevant To Interpretation Of Contracts Of Adhesion Such As The One At Issue Here.

Even were this Court to find that the "date you deposit" language is ambiguous, the sort of extrinsic evidence on which the district court here focused – evidence of one accountholder's subjective understanding of how accrual was supposed to work – would not properly be considered. Rather, the question of interpretation remains one of law, not fact, and the analysis is to be performed without reference to any parties' particularized intentions.

As this Court held in *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982)

Boilerplate provisions are . . . not the consequence of the relationship of particular borrowers and lenders and **do not depend upon particularized intentions of the parties to an indenture. There are no adjudicative facts relating to the parties to the litigation for a jury to find and the meaning of boilerplate provision is, therefore, a matter of law rather than fact.** Moreover, uniformity in interpretation is important to the efficiency of capital markets.

*Id.* at 1048 (emphasis added).

Similarly, this Court held in *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 15 (2d Cir. 2017) that "we have expressed a particular distaste for interpreting boilerplate indenture provisions based on the "relationship of particular borrowers and lenders" or the "particularized intentions of the parties to an indenture," both of which undermine "uniformity in interpretation."

These rulings are consistent with the rulings of our sister circuits around the country:

As the Third Circuit explained in its extended discussion in *Gillis v. Respond Power, LLC*, 677 F. App'x 752, 756-57 (3d Cir. 2017):

In the context of standard form contracts, like the Disclosure Statement, extrinsic evidence of individual understandings is especially irrelevant. Individual signatories to such contracts understand that they have no bargaining power as to specific terms, and they expect to be treated like all other signatories to the form document. *See Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 235 (3d Cir. 2012) (noting that a standard form contract, also called a contract of adhesion, is a "contract prepared by one party, to be signed by the party in a weaker position, usually a consumer, who adheres to the contract with little choice about the terms." (quoting *Chepkevich v. Hidden Valley Resort, L.P.*, 607 Pa. 1, 2 A.3d 1174, 1190 (Pa. 2010))). Logically, then, standard form contracts should be interpreted uniformly as to all similarly situated signatories whenever

it is reasonable to do so, rendering individual, transaction-specific interpretations inapposite. *See Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 440-41 (1st Cir. 2013) (lead opinion of equally divided en banc court); Restatement (Second) of Contracts § 211(2) & cmt. E (Am. Law. Inst. 1981).

Likewise, in *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432,

2013 WL 5394192 (1st Cir. 2013), the First Circuit held:

> we apply special principles for interpreting uniform contract language. Covenant 4 is a uniform clause used in millions of mortgages nationwide by many different lenders, so we give it one uniform meaning rather than multiple inconsistent meanings. Extrinsic evidence of the parties' unique intentions regarding a uniform clause is generally uninformative because unlike individually tailored contracts, uniform clauses do not derive from the negotiations of the specific parties to a contract. Instead, courts seek to determine the uniform meaning of the clause as a matter of law, a task appropriate for the motion to dismiss stage. Kolbe cannot avoid dismissal on the grounds that his specific understanding or the actions of the parties create an ambiguity.

*Id.* at *1-2.

See also *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1105 (11th Cir. 2014),

quoting *Akanthos Capital Mgmt., LLC v. CompuCredit Holdings Corp.,* 677 F.3d

1286, 1298 (11th Cir. 2012) (citing *Sharon Steel Corp. v. Chase Manhattan Bank,*

*N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982)) (""uniform interpretation of standard

contract language" was important because it "ensures effective functioning of our

financial markets, and begets stability.""); *Red Barn Motors, Inc. v. Nextgear*

*Capital, Inc.*, 915 F.3d 1098, 1101 (7th Cir. 2019) ("All parties concede that the

floorplan contract in this case is a standard form contract. . . . In fact, with a form

contract such as this one, uniform application and interpretation of the clauses would be expected absent evidence that the form contracts in fact had a meaning that varied from one signatory to another."); *Robin Drug Co. v. Pharmacare Mgmt. Servs.*, No. 03-3397(PAM/RLE), 2004 U.S. Dist. LEXIS 8618, at \*13 (D. Minn. May 13, 2004) ("Any ambiguity in this standardized provision can be interpreted on a class-wide basis.  Moreover, if any of the words in this provision have a particular meaning defined by industry standards, that meaning would be the same regardless of the subjective understanding of the contracting parties.

The foregoing cases are all consistent with the Restatement (Second) of Contracts, § 211(2) (Standardized Agreements), which states a standardized contract "is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.

Applying those principles here – and consistent with this Court's "particular distaste for interpreting boilerplate indenture provisions based on the "relationship of particular borrowers and lenders" or the "particularized intentions of the parties to an indenture," both of which undermine "uniformity in interpretation." (*Marblehead*) – whatever understanding Mr. Cheng expressed of his adhesion contract in his November 2019 phone calls with HSBC, like the subjective understanding of any other individual accountholder, was not properly considered.

Moreover, because the HSBC accountholder agreement must be construed against the drafter, and the meaning of the form contract is one of law not fact, any ambiguity was required to be decided in Appellant's favor at the summary judgment phase.

Applying New York law, the First Circuit recently addressed this issue in depth in the context of an ambiguous choice of law clause:

> Because the plain language of the choice-of-law provision is not broad enough to unambiguously encompass extracontractual claims, "any ambiguities must be construed in favor of the insured." *Clark Sch. for Creative Learning, Inc. v. Phila. Indem. Ins. Co.*, 734 F.3d 51, 55 (1st Cir. 2013) (applying Massachusetts law); *see J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 37 N.Y.3d 552, 162 N.Y.S.3d 851, 183 N.E.3d 443, 447 (N.Y. 2021). While both Massachusetts and New York law recognize this rule of construction, "[u]nder New York law, courts must first examine extrinsic evidence of the parties' intent before turning to doctrinal presumptions." *Aronstein*, 15 F.4th at 534 (applying New York law). However, "if the extrinsic evidence does not yield a conclusive answer as to the parties' intent, a court may apply other rules of contract construction[.]" *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 43 (2d Cir. 2006) (cleaned up) (applying New York law).
>
> Here, extrinsic evidence of the parties' intent will not aid our analysis of the policy's boilerplate choice-of-law provision. *See Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 440 (1st Cir. 2013) ("Because uniform contracts are interpreted uniformly across cases whenever it is reasonable to do so, extrinsic evidence about what a particular party intended or expected when signing the contract is generally irrelevant.") Thus, we proceed directly to the rules of contract construction. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982) ("There are no adjudicative facts relating to the parties to the litigation for a jury to find[,] and the meaning of [the] boilerplate provision[] is, therefore, a matter of law rather than fact."). When, as here, there are "competing

plausible interpretations of the insurance policy 'doubts as to the intended meaning of the words must be resolved against the insurance company that employed them.'" *Performance Trans., Inc. v. Gen. Star Indem. Co.*, 983 F.3d 20, 28 (1st Cir. 2020) (quoting *Surabian Realty Co. v. NGM Ins. Co.*, 462 Mass. 715, 971 N.E.2d 268, 271 (Mass. 2012)); *see Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 49 N.Y.S.3d 65, 71 N.E.3d 556, 560 (N.Y. 2017)

*Great Lakes Ins. SE v. Andersson*, 66 F.4th 20, 27-28 (1st Cir. 2023).  See *151 West Assocs. v. Printsiples Fabric Corp.*, 61 N.Y.2d 732, 460 N.E.2d 1344, 1345, 472 N.Y.S.2d 909 (N.Y. 1984) ("It has long been the rule that ambiguities in a contractual instrument will be resolved *contra proferentem*, against the party who prepared or presented it."); *Pettibone v. WB Music Corp.*, 767 F. App'x 145, 147 (2d Cir. 2019) ("[U]nder New York law, it is well settled 'that ambiguities in a contractual instrument will be resolved *contra proferentem*, against the party who prepared or presented it.'" (quoting *151 W. Assocs. v. Printsiples Fabric Corp.*, 61 N.Y.2d 732, 734 (1984)); *See Thomas v. Jordan*, 116 N.Y.S. 3d 486, 487 (N.Y. App. Term. 2020) ("In choosing among reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.").

In light of the foregoing, the meaning of the contractual provision in question, once deemed ambiguous, was required to be construed against HSBC as a matter of law.[4]

2. Because Extrinsic Evidence Of Individual Accountholders' Subjective Intent Is Irrelevant To Interpretation Of Contracts Of Adhesion, Denial Of Class Certification Was Improper

The district court's denial of class certification was based on the district court's belief that the November 2019 phone calls between Appellant and HSBC provided some evidence that Appellant had a subjective understanding of how interest accrual worked that is at odds with the interpretation of his contract advanced by counsel in this litigation. The court believed that this evidence of Mr. Cheng's particularized, pre-retention of counsel, pre-litigation understanding would be the "central issue in the case" at trial and reasoned that he was therefore inadequate as a class representative.

Specifically, the Court wrote, in relevant part, as follows:

Plaintiff faces serious obstacles to recovery on his individual claims. The statements he made in his 2019 phone calls are compelling evidence that he understood that, just as HSBC claims, he would not begin accruing interest until HSBC had his cash on hand. He repeatedly expressed concerns about HSBC failing to post his deposit to his account when he believed they had his money on hand, but never expressed his supposed belief that interest should have started to

---

[4] Even putting aside all of the foregoing, the district court's consideration of Mr. Cheng's subjective intent as expressed on the November 2019 phone call was irrelevant: it could not shed light on any negotiations both because there were none and because the call came six months after Mr. Cheng opened his account. See, *e.g. SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 127 (2d Cir. 2006).

> accrue as soon as he initiated the deposit, regardless of whether HSBC
> had the cash on hand. Since plaintiff now seeks to establish that he
> was misled to believe (and in fact believed) that interest would begin
> accruing as soon as he initiated a deposit, he faces an uphill
> battle on a core element of his claims. Plaintiff's path to recovery is therefore
> obstructed by a key problem that other members of the prospective
> class do not share.

A-144.

However, as outlined above, the subjective intent of individual

accountholders is irrelevant to interpretation of standardized form contracts such as

the one at issue here, and therefore irrelevant to Mr. Cheng's claims.

The district court's sole citation on this point was *Cohen v. Laiti*, 98 F.R.D.

581 (E.D.N.Y. 1983), a 41-year old case which is easily distinguishable: *Cohen*

did not involve breach of a form contract, and sounded in fraud which, unlike the

claims here, requires reliance. Moreover, the issue in *Cohen*, unlike the case at

bar, was not his subjective understanding of any particular document but his

credibility more generally (*e.g.* the named plaintiff in Cohen alleged that in

purchasing certain stock he relied on a public filing that discovery revealed was not

publicly available until after the date of his purchase). *Id.* at 582.

In contrast, Courts around the country have repeatedly rejected these attacks

on class certification based on potential differences between different

accountholders' subjective understanding of standardized form contracts.

For example, in *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d (1st Cir.

2013), the First Circuit wrote as follows:

The issue of interpreting form contract language frequently arises in the context of class action certification. Several federal courts have certified classes for contract disputes over form contracts because the form contracts are interpreted uniformly across members of the class, and thus the outcome does not depend on extrinsic evidence that would be different for each putative class member. *See, e.g.*, *Vedachalam v. Tata Consultancy Servs., Ltd.*, 18 Wage & Hour Cas. 2d (BNA) 1677, 2012 WL 1110004, at *9 (N.D. Cal. Apr. 2, 2012) ("[I]n construing the form contract between Defendants and class members, the Court need not delve into the actual knowledge of individual class members."); *Peoples v. Sebring Capital Corp.*, 52 Fed. R. Serv. 3d 197, 2002 WL 406979, at *8 (N.D. Ill. Mar. 15, 2002) ("The court also rejects the broader notion that it will generally have to examine the parties' intent on a transaction-by-transaction basis.").

*Id.* at 432, 441

Similarly, the Third Circuit has written as follows:

Because form contracts should be interpreted uniformly as to all signatories, Pennsylvania and federal courts have recognized that claims involving the interpretation of standard form contracts are particularly well-suited for class treatment. *See, e.g., Kolbe*, 738 F.3d at 441 (1st Cir. 2013) (listing federal courts that have "certified classes for contract disputes over form contracts because the form contracts are interpreted uniformly across members of the class, and . . . the outcome does not depend on extrinsic evidence that would be different for each putative class member"); *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010) (denying certification due to variation in material terms across plaintiffs' contracts, but noting that "[i]t is the form contract, executed under like conditions by all class members, that best facilitates class treatment"); *Janicik v. Prudential Ins. Co. of Am.*, 305 Pa. Super. 120, 451 A.2d 451, 457 (Pa. Super. Ct. 1982) ("Claims arising from interpretations of a form contract generally give rise to common questions."). In *Janicik*, the Pennsylvania Superior Court held that certification of the class was appropriate while also noting that there were "two reasonable interpretations [*757] of the contract language in dispute." *Janicik*, 451 A.2d at 458.

*Gillis*, 677 F. App'x 752, 756-57 (3d Cir. 2017). *See also, Salvatora v. Xto Energy Inc.*, No. 2:19-CV-01097-CRE-NR, 2023 U.S. Dist. LEXIS 96311, at *38 (W.D. Pa. June 2, 2023) ("In particular, the interpretation of the Market Enhancement clause will be common as to all Plaintiffs. Uniform interpretation of form contracts is favored and cases involving the same "are particularly well-suited for class treatment.") (citations omitted).

*Id.*

The Seventh Circuit likewise rejected this sort of attack in *Red Barn Motors, Inc. v. Nextgear Capital, Inc.*, 915 F.3d 1098, 1101 (7th Cir. 2019):

> Here, Comerica attempts to defeat typicality by arguing that Plaintiffs' different expectations and preferences regarding the use of overdrafts and posting order render them atypical of the class. However, it is the defendant's common course of conduct, not the class representatives' subjective expectations or preferences, which governs considerations of typicality. *See Johnson v. GEICO Cas. Co.*, 673 F. Supp. 2d 255, 275-78 (D. Del. 2009). Plaintiffs and the members of the class are all challenging the same overdraft policies of Comerica and seeking to recover the additional overdraft fees they incurred as a result of Comerica's re-sequencing of their transactions. This is true irrespective of the cause of action alleged. Moreover, to the extent that expectations are relevant, an objective standard governs. For example, with respect to Plaintiffs' breach of contract claim, the Restatement recognizes that "[s]uch a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." RESTATEMENT (SECOND) CONTRACTS § 211(2). Plaintiffs' claims can thus be established by common proof of Comerica's uniform application of high-to-low posting and related devices like the Matrix to the members of the Class and the Bank's concealment of its overdraft practices that affect Plaintiffs and the class alike. Similarly, with respect to Plaintiffs' claim for unconscionability,

differences in characteristics such as education, age, experience, and sophistication between Plaintiffs and the class do not render them atypical since common proof can be used to establish that the conduct alleged by Plaintiffs was uniformly unconscionable. Likewise, with respect to Plaintiffs' unjust enrichment claim, differences in the degree of customer awareness do not establish atypicality since Plaintiffs contend that Comerica's concealment of its overdraft policies prevented both Plaintiffs and the class members from gaining sufficient knowledge to understand and appreciate Comerica's scheme and how it affected them. . . . .

In sum, the Court finds that Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent class members. . . [A]ll Plaintiffs and members of the proposed class, whose accounts were governed by common and materially uniform Deposit Agreement, were subjected to Comerica's uniform practice of re-sequencing debit card transactions from high-to-low, and Plaintiffs allege that they and all members of the proposed class were assessed additional overdraft fees as a result. Therefore, the Court finds that the typicality requirement is met.

*Id.* at 1101.

In *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645 (S.D. Fla. 2012),

a District Court likewise rejected a similar attack on class certification:

Wells Fargo contends that Plaintiffs' claim for breach of the contractual covenant of good faith and fair dealing requires an assessment of individual expectations. To the extent expectations are relevant, however, an objective standard governs; individual expectations are irrelevant. *See Union Bank*, 275 F.R.D. at 680 ("For example, it is not the case that the individual Plaintiffs' and class members' subjective expectations are necessary to prove their claims. To the contrary, breach of the covenant good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective bad faith or objectively unreasonable conduct"); *Comerica*, 286 F.R.D. at 657. The Restatement recognizes that "[s]uch a writing is interpreted wherever reasonable as treating alike all those similarly situated, *without regard to their knowledge or understanding of the standard terms of the writing*." RESTATEMENT (SECOND) OF CONTRACTS §

211(2) (1981) (emphasis added). Hence, that some customers might have superior knowledge is immaterial. "[C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it. The result may be to give [*643] the advantage of a restrictive reading to some sophisticated customers who contracted with knowledge of an ambiguity or dispute." *Id.* at cmt. e. This claim can be established by common proof of Wells Fargo's uniform application of high-to-low posting and related devices like the "shadow line" to the members of the class and the Bank's concealment of its overdraft practices that affected Plaintiffs and the class alike.

Differences in the degree of customer awareness do not establish atypicality here. . . . The evidence regarding Wells Fargo's scheme, including its uniform misrepresentations and concealment of its overdraft practices, renders Plaintiffs' unjust enrichment and unconscionability claims typical of the class claims.

*Id.* at 653-54. *See also, In Martinez v. Wells Fargo Bank, N.A. (In re Checking Account Overdraft Litig.)*, 307 F.R.D. 630, 642-43 (S.D. Fla. 2015).

Similarly, in *Bartle v. TD Ameritrade Holdings Corp.*, No. 20-00166-CV-W-BP, 2021 U.S. Dist. LEXIS 214158, (W.D. Mo. Sep. 15, 2021), the Court ruled as follows:

Defendant's second argument . . . is that the Agreement may have meant different things to different class members, requiring individual inquiries into the knowledge and experience of each class member. (Doc. 94, pp. 38-41.) The Court disagrees. Missouri courts, when interpreting standard-form contracts, follow the approach of the Second Restatement of Contracts, which provides that "[s]uch a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge of [*33] the standard terms of the writing." *Spychalski v. MFA Life Ins. Co.*, 620 S.W.2d 388, 393 n.6 (Mo. Ct. App. 1981) (quoting RESTATEMENT (SECOND) OF CONTRACTS 2d § 237(2)). Because the Agreement is a standard-form contract, the Court must interpret it the same way with

respect to all Scottrade customers who signed it—meaning that no individualized inquiry into the knowledge and experience of those customers is necessary. *Spychalski*, 620 S.W.2d at 393 n.6 ("Thus, it is not the reasonable expectation of the singular [customer] to which the law gives effect, but that of the average member of the public who accepts it.").

*Id.* at *32-33.

In light of the foregoing, the district court's class certification decision in the case at bar – which was based on the mistaken belief that Appellant's subjective understanding of the contract provisions at issue would be the central issue in the case – "rest[ed] on an error of law" and "cannot be located within the range of permissible decisions." *Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 250-51 (2d Cir. 2011) (quotations omitted).

## IX.    CONCLUSION

For the foregoing reasons, and to the extent set forth above, the district court's judgments and orders should be reversed.

Dated:  January 29, 2024

Respectfully submitted,

 *s/ Daniel A. Schlanger*

DANIEL A. SCHLANGER
SCHLANGER LAW GROUP, LLP
80 Broad Street, Suite 3103
New York, NY 10004
T. (212) 500-6114
F. (646) 612-7996
dschlanger@consumerprotection.net

BETH E. TERRELL
TERRELL MARSHALL LAW GROUP PLLC

42

936 North 34th Street, Suite 300
Seattle, WA 98103
T. (206) 816-6603
F. (206) 319-5450
bterrell@terrellmarshall.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 32.1(a)(4) because this brief contains 10,699 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

January 29, 2024                 */s/ Daniel A. Schlanger*
                                        Daniel A. Schlanger

                                        *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Daniel A. Schlanger*
Daniel A. Schlanger