# 23-7383-CV

## United States Court of Appeals

### for the

## Second Circuit

**JI DONG CHENG,**

*Plaintiff-Appellant,*

*– v. –*

**HSBC BANK USA, N.A.,**

*Defendant-Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

## BRIEF OF DEFENDANT-APPELLEE

ANDREW J. SOVEN
HOLLAND & KNIGHT, LLP
1650 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 252-9600
Andrew.Soven@hklaw.com

QIAN (SHEILA) SHEN
HOLLAND & KNIGHT, LLP
787 Seventh Avenue, 31st Floor
New York, NY 10019
(212) 513-3200
Qian.Shen@hklaw.com

*Attorneys for Defendant-Appellee
HSBC Bank USA, N.A.*

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellee/Defendant HSBC Bank USA, N.A., hereby states that HSBC Bank USA, N.A., is a wholly owned subsidiary of HSBC USA Inc., which is indirectly owned by HSBC Holdings plc, a United Kingdom Corporation. The shares of HSBC Holdings plc are traded on certain foreign stock exchanges and are traded over the counter in the United States as sponsored American depository receipts.

## TABLE OF CONTENTS

DISCLOSURE STATEMENT .................................................................. ii

TABLE OF CONTENTS .................................................................. iii

TABLE OF AUTHORITIES .................................................................. v

PRELIMINARY STATEMENT .................................................................. 1

COUNTERSTATEMENT OF THE ISSUES .................................................. 3

COUNTERSTATEMENT OF THE CASE .................................................. 4

   A.   HSBC's Direct Savings Account .................................................. 4

   B.   Cheng Opens a DSA in May 2019. .................................................. 4

   C.   Cheng Makes Two Deposits. .................................................. 6

   D.   Cheng's Conversations with HSBC Following the November Transfer. .................................................. 6

   E.   Cheng's Other Contemporaneous Lawsuits Against Large Banks .............. 10

   F.   Procedural Background .................................................. 11

SUMMARY OF ARGUMENT .................................................. 14

STANDARD OF REVIEW .................................................. 17

ARGUMENT .................................................. 17

   I.   The Court has no jurisdiction over Cheng's appeal from the denial of HSBC's motion for summary judgment. .................................................. 17

   II.   The District Court did not abuse its discretion in denying Cheng's Motion for Class Certification. .................................................. 18

      A.   The District Court properly evaluated evidence of Cheng's credibility and litigation history in ruling on his Motion for Class Certification. .................................................. 20

      B.   Evidence of Cheng's pre-litigation telephone calls directly relates to the issues in this case. .................................................. 27

         1.   Evidence of Cheng's telephone calls is relevant to Cheng's GBL § 349 claim. .................................................. 28

         2.   Evidence of Cheng's telephone calls is relevant to his breach-of-contract claim. .................................................. 30

a.  The Court should reject Cheng's contention that the Disclosure
    language is unambiguous in his favor.......................................30

b.  The Court should reject Cheng's contention that the District
    Court erred in considering extrinsic evidence. .........................33

III.  The District Court correctly dismissed Cheng's EFTA claim. ....................40

A.  EFTA is administered through Regulation E...........................................40

B.  The District Court correctly concluded that HSBC did not violate
    EFTA or Regulation E. .........................................................................42

CONCLUSION .......................................................................................................49

CERTIFICATE OF COMPLIANCE.....................................................................51

CERTIFICATE OF SERVICE ...............................................................................52

TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Akanthos Capital Management, LLC v. CompuCredit Holdings Corp.*,
    677 F.3d 1286 (11th Cir. 2012) ...................................................36, 37

*Archbold v. Sols. Fed. Credit Union*,
    2012 WL 5617845 (W.D.N.Y. Nov. 15, 2012) ....................................43

*Avritt v. Reliastar Life Ins. Co.*,
    615 F.3d 1023 (8th Cir. 2010) ............................................................36

*Axiom Investment Advisors LLC v. Deutsche Bank AG*,
    No. 15-9945, 2018 WL 4253152 (S.D.N.Y. Sept. 6, 2018) ...............39

*Azose v. J.P. Morgan Chase Bank*,
    2010 WL 376632 (E.D.N.Y. Jan. 26, 2010), *aff'd sub nom. Azose
    v. J.P. Morgan Chase Bank, Nat. Ass'n*, 411 Fed. Appx. 387 (2d
    Cir. 2011) ...........................................................................................41

*Azose v. Washington Mut. Bank*,
    588 F. Supp. 2d 366 (E.D.N.Y. 2008) ...............................................42

*Bank of Am. v. Cooper*, 63 Misc 3d 1214 n.3 (A) [Civ. Ct. 2019] .........................34

*Barry B. Roseman, D.M.D., M.D., Profit Sharing Plan v. Sports and
    Recreation*, 165 FRD 108 (M.D. Fla. 1996).......................................26

*Berenson v. Nat'l Financial Serv., LLC*,
    403 F. Supp. 2d 133 (D. Mass. 2005).........................................47, 48

*Bibicheff v. PayPal, Inc.*
    No. 2:17-CV-4679 (DRH)(AYS), 2020 WL 2113373 (E.D.N.Y.
    May 4, 2020), *aff'd*, 844 F. App'x 394 (2d Cir. 2021).......................30

*Buzoiu v. Risk Mgmt. Alternatives, Inc.*,
    No. CIV.A. 03-3579, 2004 WL 1505061 (E.D. Pa. June 14, 2004) ......21, 23, 24

*Cheng v. JP Morgan Chase*,
    No. 20-cv-1636 (E.D.N.Y.) ...................................................10, 16, 27

*Cheng v. T.D. Bank, N.A.*,
    2022 WL 2316175 (E.D.N.Y. June 28, 2022) .................................................. 11

*Cheng v. T.D. Bank, N.A.*,
    No. 22-1633, 2022 WL 18461488 (2d Cir. Sept. 30, 2022) ....................... 11, 27

*CIBC World Markets Corp. v. TechTrader, Inc.*,
    183 F. Supp. 2d 605 (S.D.N.Y. 2001) ............................................................ 35

*Cohen v. Beneficial Industrial Loan Corp.*,
    337 U.S. 541 (1949) ....................................................................................... 20

*In re Currency Conversion Fee Antitrust Litig.*,
    773 F. Supp. 2d 351 (S.D.N.Y. 2011) ............................................................ 48

*Deutsche Bank Secs., Inc. v. Rhodes*,
    578 F. Supp. 2d 652 (S.D.N.Y. 2008) ............................................................ 48

*E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*,
    241 F.3d 154 (2d Cir. 2001) .......................................................................... 32

*Feaz v. Wells Fargo Bank, N.A.*,
    745 F.3d 1098 (11th Cir. 2014) ..................................................................... 38

*Fishon v. Peloton Interactive, Inc.*,
    No. 19-11711, 2022 WL 179771 (S.D.N.Y. Jan. 19, 2022) ................. 22, 23, 25

*Gillespie v. St. Regis Residence Club, New York Inc.*,
    461 F. Supp. 3d 96 (S.D.N.Y. 2020) .............................................................. 38

*Ginn v. Concord Arena Parking, LLC*,
    No. 23-429-CV, 2024 WL 658836 (2d Cir. Feb. 16, 2024) ........................ 31, 34

*Goetsch v Shell Oil Co.*,
    197 F.R.D. 574 (W.D.N.C. 2000) .................................................................. 27

*Hoyt v. Andreucci*,
    433 F.3d 320 (2d Cir. 2006) .......................................................................... 35

*In re Vargas Realty Enterprises, Inc.*,
    440 B.R. 224, 237 (S.D.N.Y. 2010) ............................................................... 34

*JA Apparel Corp. v. Abboud*,
   568 F.3d 390 (2d Cir. 2009) ................................................................35

*Jane B. by Martin v. New York City Dep't of Soc. Servs.*,
   117 F.R.D. 64 (S.D.N.Y. 1987) ...........................................................22

*Kline v. Wolf*,
   702 F.2d 400 (2d Cir. 1983) ........................................................21, 29

*Kolbe v. BAC Home Loans Servicing, LP*,
   738 F.3d 432 (1st Cir. 2013) .......................................................36, 37

*L.S. v. Webloyalty.com, Inc.*,
   954 F.3d 110 (2d Cir. 2020) ........................................................41, 47

*Levitt v. J.P. Morgan Sec., Inc.*,
   710 F.3d 454 (2d Cir. 2013) ................................................................20

*Lin v. Canada Goose US, Inc.*,
   No. 21 CIV. 7614 (LGS), 2022 WL 16926312 (S.D.N.Y. Nov. 14,
   2022) ...................................................................................................29

*Maurizio v. Goldsmith*,
   230 F.3d 518 (2d Cir. 2000) ................................................................28

*Maye v. City of New Haven*,
   89 F.4th 403 (2d Cir. 2023) ........................................................17, 18

*Mazzei v. Money Store*,
   829 F.3d 260 (2d Cir. 2016) ................................................................17

*McCabe v. Lifetime Entm't Servs., LLC*,
   761 F. App'x 38 (2d Cir. 1998) ...........................................................17

*Mitchell v. Wells Fargo Bank*,
   280 F. Supp. 3d 1261 (D. Utah 2017)..................................................38

*In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund
   (Retirement Accounts) II, L.P. Sec. Litig.*,
   149 F.R.D. 506 (D. Del. 1993) ............................................................26

*Monaco v. Sullivan*,
   737 Fed. Appx. 6 (2d Cir. 2018)...........................................................25

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
  760 F.3d 151 (2d Cir. 2014) ................................................................47

*Olen v. N. Tier Retail, LLC*,
  2012 WL 1580994 (D. Minn. May 4, 2012)......................................42

*Paese v. Hartford Life & Accident Ins. Co.*,
  449 F.3d 435 (2d Cir. 2006) ...............................................................31

*Pahuta v. Massey–Ferguson, Inc.*,
  170 F.3d 125 (2d Cir. 1999) ...............................................................18

*Panzirer v. Wolf*
  663 F.2d 365 (2d Cir. 1981), *vacated sub nom. Price Waterhouse
  v. Panzirer*, 459 U.S. 1027 (1982)................................................21, 22

*Pullman v. Alpha Media Pub., Inc.*,
  624 Fed. Appx. 774 (2d Cir. 2015)....................................................31

*Ritchie v. N. Leasing Sys., Inc.*,
  No. 12-CV-4992 (KBF), 2016 WL 1241531 (S.D.N.Y. Mar. 28,
  2016) .................................................................................................28, 29

*Roberts v. Consol. Rail Corp.*,
  893 F.2d 21 (2d Cir. 1989) ..................................................................35

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare*,
  601 F.3d 1159 (11th Cir. 2020) ..........................................................38

*Savino v. Computer Credit, Inc.*,
  164 F.3d 81 (2d Cir. 1999) ..........................................17, 21, 23, 26

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*
  691 F.3d 1039 (2d Cir. 1982) ................................................36, 37, 38

*Sosna v. Iowa*,
  419 U.S. 393 (1975)...............................................................................20

*Stutman v. Chem. Bank*,
  731 N.E.2d 608 (N.Y. 2000).................................................................28

*Torres v. Gristede's Op. Corp.*,
  No. 04 Civ. 3316, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006)......22

*Turner v. General Motors Acceptance Corp.*,
  180 F.3d 451, 456 & n.5 (2d Cir. 1999) .......................................44, 45

*UFCW Local 1776 v. Eli Lilly & Co.*,
  620 F.3d 121 (2d Cir. 2010) .................................................17

*United States v. Desposito*,
  704 F.3d 221 (2d Cir. 2013) .................................................43

*In re Vitamin C Antitrust Litig.*,
  279 F.R.D. 90 (E.D.N.Y. 2012)..........................................20

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).........................................................20

*Weiss v. Union Cent. Life Ins. Co.*,
  28 Fed. Appx. 87 (2d Cir. 2002)........................................18

*Yuille v. Uphold HQ Inc.*,
  2023 WL 5206888 (S.D.N.Y. Aug. 11, 2023)...................47

*Zervos v. Verizon N.Y., Inc.*,
  252 F.3d 163 (2d Cir. 2001) ..............................................17

### Statutes

28 U.S.C.A. § 1291 ..............................................................17

15 U.S.C. § 1693b(a)(1)........................................................41

15 U.S.C. § 1693b(b) ............................................................41

15 U.S.C. § 1693c(a)..............................................40, 41, 42, 43

15 U.S.C. § 1693m (d) ..........................................................41

N.Y. Gen. Bus. Law § 349.............................................*passim*

N.Y. Gen. Bus. Law § 350.....................................................11

### Other Authorities

12 C.F.R. Part 1005, Supp. I ¶ 7(b)(5)(1), (2) ........................46

12 C.F.R. Part 1005, Supp. I, ¶ 9(b)(3)-3 ...............................................46

12 C.F.R. § 1005.7(a)...............................................................41, 46

12 C.F.R. § 1005.7(b)(5)............................................................43, 45

12 C.F.R. § 1005.9(b)(3)...............................................................46

12 C.F.R. § 1005 ....................................................................*passim*

12 C.F.R. § 1005.7(a)...............................................................40, 41

12 C.F.R. § 1005.7 (b)(5)..............................................................43

Fed. R. Civ. P. 23(a)...................................................................20

Federal Rule of Appellate Procedure 30(b)(1) ...........................................9

https://www.merriam-webster.com/dictionary/charge ...........................................43

https://www.merriam-webster.com/dictionary/fee .................................................44

Rule 23 ...............................................................................20

Rule 23(a)(4) ........................................................................20

## PRELIMINARY STATEMENT

Ji Dong Cheng's appeal should fail. The District Court properly refused to certify this case as a class action because Cheng is an inadequate class representative, in part because evidence of his pre-litigation telephone calls with HSBC Bank USA, N.A. ("HSBC") is contrary to the theory of his case. Instead of focusing on the order denying his Motion for Class Certification, which is subject to abuse of discretion standard, Cheng devotes much of his brief in this Court to challenging the District Court's order *denying* HSBC's motion for summary judgment. Cheng's arguments are improper and unavailing.

In 2019, Cheng opened a Direct Savings Account ("DSA") with HSBC and made two $100,000 Automated Clearing House ("ACH") fund transfers into his DSA. After the second ACH transfer, Cheng telephoned HSBC and repeatedly accused the bank of having his funds but deliberately not posting them to his account to avoid paying him interest on his deposits for a few days. Cheng's accusations were based on his mistaken assumption that his ACH transactions were completed the same day they were initiated. Nonetheless, Cheng's 2019 recorded telephone calls with HSBC revealed Cheng's understanding at that time that interest should begin to accrue when HSBC received his funds.

Soon after his recorded telephone calls with HSBC, Cheng retained counsel and filed this suit, asserting an entirely new theory—instead of alleging that HSBC

1

had intentionally delayed posting his funds to his account, the lawsuit alleged that HSBC promised in a disclosure that interest would accrue when an ACH fund transfer was initiated, as opposed to when HSBC received the funds. After lengthy litigation in the District Court, Cheng filed a Motion for Class Certification. The District Court denied his motion on the grounds that Cheng was not an adequate class representative. The District Court held that Cheng faced "serious obstacles to recovery on his individual claims" because his pre-litigation telephone calls were contrary to the allegations in his lawsuit. Thus, his path to recovery was obstructed by a key problem the putative class members did not have. The District Court also cited Cheng's contradictory testimony and his prior litigation and banking history as compounding his inadequacy as a class representative.

In challenging the District Court's order denying his Motion for Class Certification, Cheng also purports to appeal the District Court's order *denying* HSBC's motion for summary judgment. His argument fails for multiple reasons. *First*, this Court lacks jurisdiction over the District Court's order denying HSBC's summary judgment motion. *Second*, having argued in the District Court that the disclosure was ambiguous in his response to HSBC's motion for judgment on the pleadings, Cheng cannot now argue that the District Court erred in so holding. *Third*, having argued that the District Court could consider evidence of his pre-litigation telephone calls with HSBC in his response to HSBC's motion for summary

2

judgment, Cheng cannot now argue that the District Court erred in considering that very evidence. *Fourth*, Cheng is mistaken that New York law prohibits courts from considering evidence of the parties' intent in construing an agreement under the circumstances present here. *Fifth*, even if Cheng's telephone calls were not relevant to his breach of contract claim, Cheng's brief ignores that the telephone calls are relevant to his claim under New York General Business Law ("GBL") § 349. The Court should affirm the District Court's denial of Cheng's Motion for Class Certification for all of these reasons.

Cheng also appeals the Court's entry of judgment in HSBC's favor on his claim based on the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.* The District Court rightly found that a right to future interest is not a "charge" or "fee" requiring the disclosure required by EFTA. There is nothing in the plain language of EFTA or the federal regulations implementing EFTA that support this clearly meritless claim. Accordingly, the Court should also affirm the District Court's dismissal of Cheng's EFTA claim.

## COUNTERSTATEMENT OF THE ISSUES

1.     Whether the District Court abused its discretion in denying Cheng's motion for class certification given that Cheng's pre-litigation interpretation of the disclosure, lack of credibility, and litigation and banking history undermined his claims and made him an inadequate class representative.

3

2.      Whether the District Court erred in dismissing Cheng's claim under EFTA given that the allegedly uncredited interest at issue is not a "fee" or "charge" requiring disclosure under those laws.

**C**OUNTERSTATEMENT OF THE **C**ASE

**A.      HSBC's Direct Savings Account.**

HSBC is a nationally chartered bank that serves customers through its various personal, private, and commercial banking products.  For approximately three years beginning in 2019, HSBC offered a deposit account product called a Direct Savings Account. A-14.

**B.      Cheng Opens a DSA in May 2019.**

On May 21, 2019, Cheng visited HSBC's website and applied for a DSA. A-96. As part of Cheng's application, Cheng received and agreed to be bound by several documents, including HSBC's Electronic Balance Transfer Service ("EBTS") agreement. A-70, A-96.  The EBTS informed Cheng that transfer requests would be processed on business days and that "[t]he Electronic Bank Transfer may take up to four business days before it is credited to your HSBC account." A-72. The EBTS also informed Cheng that his "HSBC account(s) will be subject to HSBC's Rules for Consumer Deposit Accounts." A-39, A-70.

The Rules for Consumer Deposit Accounts (the "Rules") state that they "shall be governed by and interpreted according to federal law, and by applicable state law,

4

clearing house rules, ACH rules and general commercial bank practices applicable to the services provided, to the extent not superseded by federal law." A-39. The Rules informed Cheng that "any rules or regulations of any automated clearing house ("ACH") used shall be fully applicable and binding upon" Cheng. A-54. The Rules also provide that "[i]nterest rates, compounding periods, balance computation methods, and minimum balance requirements are explained in the Terms and Charges Disclosures." A-57–58.

The relevant Terms and Charges Disclosure ("Disclosure") contains the language at issue in this suit. A-77. The Disclosure states that "[i]nterest begins to accrue on the Business Day you deposit noncash items (e.g., checks)." A-77. HSBC defines a "Business Day" as "every day except Saturday, Sunday and Federal holidays." A-26.

HSBC approved Cheng's online application to open a DSA account (the "HSBC Account"). Before opening his account, Cheng reviewed third-party websites and HSBC's website to find savings accounts that would pay a high interest rate. A-98. One of the selling points for Cheng to open an account with HSBC was the high interest rate it offered. A-98. Neither HSBC's website nor marketing materials provided any information concerning when interest begins to accrue for ACH transfers into DSA. A-98.

5

## C.    Cheng Makes Two Deposits.

On May 30, 2019, Cheng initiated an ACH transfer of $100,000 from a Goldman Sachs account to his HSBC Account (the "May Transfer"). A-97. After initiating the May Transfer, Cheng received an email from HSBC stating that "we have debited these funds from your original funding account and will deposit them into your new account within 3 business days." A-97.  The May Transfer was received, posted, and began to accrue interest on June 4, 2019.  Until this lawsuit was filed, Cheng never objected to the timing of interest accrual with respect to the May Transfer. A-97.

On November 25, 2019, the Monday before the Thanksgiving holiday, Cheng initiated a second ACH transfer of $100,000 from his Goldman Sachs account to his HSBC Account (the "November Transfer"). A-98. After initiating the November Transfer, HSBC notified Cheng by email that he "should expect to see the funds in the destination account within 3 business days." A-98. The November Transfer was received, posted, and began to accrue interest on Friday, November 29, 2019. A-98.

## D.    Cheng's Conversations with HSBC Following the November Transfer.

Cheng's November Transfer triggered a fraud/risk alert within HSBC, and HSBC called Cheng on Tuesday, November 26, 2019, to verify the transaction. A-101.  At that time, Cheng verified the transaction but mistakenly concluded from the

6

call that the transaction had been completed—*i.e.*, that HSBC had already received the transferred funds from Goldman Sachs. A-101.

During a series of phone calls with HSBC customer service representatives between November 26 and December 6, 2019, Cheng rebuked HSBC for (supposedly) receiving the November Transfer funds on November 26 but failing to post the funds to his HSBC Account until November 29. A-101-02. Cheng never mentioned the Disclosure or argued that interest should have begun to accrue when his ACH transfers were initiated. A-102. To the contrary, the transcripts from the telephone calls reflect Cheng's understanding and agreement that interest should accrue when HSBC received the funds:

> Cheng: I understand! I understand what you mean. If I initiate on 25th, right, maybe internal system process at HSBC take three days to end out the credit to other bank and the other bank take another five days to release the money, so there is a gap of eight days. So even though I initiate on November 25th, the money actually post to my HSBC Bank on December 2nd. That's perfect, if the money released from other bank on December 2nd, the HSBC post on December 2nd. *That's fine. The thing I am talking about, HSBC receive the money on November 26. It did not post to my account. You already have the money on hand, but you intentionally did not post the account. You wait for three days.* I think if I did not call, you probably wait for five days because the representative tell me it take at least three to five business days for the transaction to post it. Okay? *So this is a thing that I have problem with.*

> HSBC: Mhmm.

> Cheng: It not --- *if the process takes long, that's fine! But the problem I am having is HSBC receive the money.* So the process take

7

much faster. The process actually take one business day. I initiate on November 25th; on November 26th, other bank already had receive the request, and other bank release the money, and on the same day that HSBC receive the money. So whatever excuse you gave me --- take a couple --- that doesn't apply anymore because this transaction was completed in one day. *So my concern is after HSBC receive the money, you did not post it. You intentionally hold it and wait for couple days. To me, that's not acceptable. That the reason I am talking about.* I raise that issue before I file complaint to the Consumer Financial Protection Bureau and ask them to investigate. I would rather to discuss that with HSBC first.

A-102-03.

Cheng:   I can show you all of the evidence, okay? I just complete—I just told you, right?—complete another bank to bank transfer, internet transfer, yesterday. I can --- I can show you the transaction. It's the same; it deducted from my sourcing bank, and I posted to my destination bank on the same day. This is between Capital One Bank, the sourcing is Capital Bank; the destination is a bank, small bank, called The VRO Bank. Okay? So, I also had many transaction with all different kind of bank: big and small. This is always consistent – the same day. *And what you tell me, it take three or five business days, is absolutely makes no sense. It's just the way that HSBC to evade attach the interest that you owe me. That's the only motivation. That's the only techniques that you try to play.*

HSBC:    The reason why it may take longer, of three business days or more, is because it will undergo a clearing process. Um, the reason why I ask if you received an email is because there is statement right in there …

Cheng:   No. *No. I --- I --- I don't care about the email.* Okay? All I care is I look at the transaction. I look at when is my money withdraw from other bank, when is the money posted to my HSBC account, okay? *Don't tell me HSBC takes five days to post the money after you receive it.*

8

....

HSBC:    You received an email about a timeframe that the Bank advised you that it would take three business days.

Cheng:   No!  Yeah!  *But the reality is the Bank receive the money in one day.  You got my money.  You intentionally did not post it.*

A-103-04.  At his deposition, Cheng again said that he believed HSBC had received the funds on Tuesday, November 26, but "tricked me and say how, HSBC has not received the money yet."  SA-113.

Cheng owns dozens of bank accounts at numerous banks and regularly moves money between accounts to take advantage of higher interest rates. A-141.  Cheng's expectations about how ACH transactions are processed were based "on my experience and my observation with […] a hundred plus ACH transactions with other bank[s]." A-105. Based on those transactions with other banks, Cheng believed that "when I made the non-cash deposit, electronic transfer, I should earn interest from day one."[1]  SA-166.

Cheng's understanding was not based on the Disclosure or the other account documents.  To the contrary, Cheng admitted he did not read the Disclosure until after he initiated the November Transaction: "Q: Did you look at it before then?  A: Nope."  SA-59.  Cheng admitted that "I did not do my homework …. I did not go

---

[1]    HSBC has submitted a supplemental appendix in light of Cheng's failure to comply with Federal Rule of Appellate Procedure 30(b)(1).

9

through a document to find the contract what the verbiage is, so I just picked up a phone, you know, tried to debate with them about the interest." SA-106.

Cheng also admitted that did not read the EBTS statement that an electronic bank transfer request would be processed on business days and "may take up to four business days before it is credited to your HSBC account." A-134. As noted by the District Court in its summary judgment opinion, Cheng later contradicted this testimony, creating still further problems related to his believability. A-145.

## E. Cheng's Other Contemporaneous Lawsuits Against Large Banks

Cheng was involved with several other disputes with financial institutions around the same time his dispute with HSBC began. In late November 2019, Cheng filed a complaint against JP Morgan Chase Bank N.A. ("JPMC") with the Consumer Financial Protection Bureau ("CFPB") regarding a $600 charge on his credit card account in connection with the purchase of a sandwich. SA-230. Then, in March 2020, Cheng filed the instant lawsuit. Less than a week later, and using the same counsel, Cheng filed suit against JPMC based on the same facts alleged in his CFPB complaint. *Cheng v. JP Morgan Chase*, No. 20-cv-1636 (E.D.N.Y.); SA-231.

In June 2021, Cheng filed a third suit, this time a purported class action against TD Bank N.A. (again, with the same counsel), in connection with an alleged promise to give him a $200 incentive payment. SA-171. In that case, Cheng asserted the same claims against TD Bank that he asserted against HSBC in this case—for

alleged violations of EFTA and New York General Business Law §§ 349 and 350, and for breach of contract. *See Cheng v. T.D. Bank, N.A.*, 2022 WL 2316175, at *1 (E.D.N.Y. June 28, 2022). In June 2022, the District Court dismissed Cheng's claims against TD Bank, reasoning that Cheng had misinterpreted TD Bank's terms for the $200 incentive payment. *Id.* at *5 ("Plaintiff reads the Bank's language too generously."). Cheng appealed, but then withdrew his appeal, presumably by settling his claim against TD Bank on an individual basis. *See Cheng v. T.D. Bank, N.A.*, No. 22-1633, 2022 WL 18461488, at *1 (2d Cir. Sept. 30, 2022).

## F.    Procedural Background

On March 25, 2020, Cheng filed this lawsuit as a putative class action through which he sought to represent all owners of DSA accounts who received the allegedly misleading Disclosure related to interest accrual. A-2. Cheng's Complaint alleged that HSBC misrepresents to customers that interest begins to accrue the same business day funds are deposited. A-14. Cheng asserted claims for alleged violation of the EFTA, breach of contract, and violation of Section 349 of the GBL. A-14-15. Cheng sought to represent nationwide classes in connection with each claim. A-14.

On July 27, 2020, HSBC moved for judgment on the pleadings on all of Cheng's claims. A-4. HSBC argued that Cheng's breach of contract and GBL claims failed because the phrase "interest begins to accrue when you deposit noncash items" refers to when an ACH transaction is completed and the receiving bank receives the

funds. A-28. HSBC also contended that Cheng's EFTA claim failed because the unearned interest in dispute is not a "fee" that must be disclosed pursuant to EFTA. A-31.

In his response to HSBC's motion for judgment on the pleadings, Cheng argued that "the relevant [HSBC] agreements are at best ambiguous" SA-34; *see also* SA-29 ["at a minimum, the phrase is ambiguous"] Cheng also relied on the opinion of his purported banking expert, Cathy Glassman, that the "you deposit" language in the Disclosure is "subject to multiple interpretations by a consumer." SA-36. Consistent with Cheng's argument, the District Court ruled that the term "you deposit" in HSBC's Disclosure was ambiguous because it was open to different reasonable interpretations and that a fuller record was needed before Cheng's contract and GBL claims could be decided. A-30. The District Court also held that Cheng's EFTA claim failed as a matter of law and dismissed Cheng's EFTA claim. A-33.

After extensive discovery, HSBC moved for summary judgment on Cheng's contract and GBL claims. A-10. HSBC argued that the evidence, including the recorded telephone calls between Cheng and HSBC, supported HSBC's interpretation of the Disclosure that interest on ACH transfers would begin to accrue when HSBC received the transferred funds.

12

Cheng responded to HSBC's motion for summary judgment by arguing that "ambiguous agreements must be construed against the drafter of a contract of adhesion or when extrinsic evidence sheds no light on the parties' intent." SA-199. In making this argument, Cheng relied on extrinsic evidence to support his interpretation of the relevant language. In fact, Cheng relied extensively on the transcripts of his telephone calls with HSBC, arguing that they somehow supported the interpretation he advanced in the litigation.

The District Court denied HSBC's motion for summary judgment. A-133. The District Court expressed concern about Cheng's honesty, observing that it "sure does sound like plaintiff's understanding [during the November 2019 phone calls] was that interest would not begin to accrue until HSBC had cleared funds in hand." A-133. The District Court also noted Cheng's contradictory deposition testimony regarding whether he had read the relevant account agreements when he applied for the Account. A-134. Nonetheless, the District Court determined that, even if the District Court doubted Cheng's credibility, a jury potentially could believe him. The District Court therefore denied summary judgment. A-133-34.

In July 2023, Cheng filed his Motion for Class Certification. A-12. HSBC responded to the Motion on several grounds, including that Cheng had not shown he was an adequate representative of the putative class. A-12. HSBC, citing this Court's precedent, argued that Cheng was an inadequate representative because his own

prior statements were directly at odds with the Complaint and that he was unfit to represent a class.

On September 12, 2023, the District Court denied Cheng's Motion on the ground that Cheng failed to demonstrate that he would be an adequate class representative. A-13, A-136-46. Following that ruling, Cheng advised the District Court that it should not retain jurisdiction over his individual claims. A-112. As a result, the District Court entered judgment against Cheng due to lack of subject matter jurisdiction. A-147. Cheng timely filed his Notice of Appeal. A-148.

## SUMMARY OF ARGUMENT

Under Second Circuit law, the District Court can consider the honesty and trustworthiness of the named plaintiff as part of its evaluation of adequacy. Prior to hiring counsel, Cheng told HSBC, in recorded phone conversations, that he understood that interest begins to accrue once funds are received by a bank. A-101-04. After retaining counsel, Cheng did a 180-degree turn, and now argued that the Disclosure was misleading and, regardless of basic banking principles, HSBC had in fact promised that interest would begin to accrue when a transaction was initiated, *i.e.*, before HSBC received the money. The District Court found the circumstances related to Cheng's position change were so egregious that Cheng was unfit to represent a class. A-138-46.

14

Because his own words are so problematic, on appeal, Cheng tries hard to all but eliminate his role in the litigation and instead tries to appeal the District Court's denial of *HSBC's* summary judgment motion. Br. at 8. In connection with an appeal of a ruling in his favor, Cheng argues that all evidence related to Cheng's "subjective understanding" of the circumstances should never be heard by fact-finder because, according to Cheng, either the Disclosure is unambiguous in his favor or, alternatively, so long as the disclosure is ambiguous, the Disclosure must be construed against HSBC without regard to and all extrinsic evidence is therefore irrelevant. Br. at 34. In other words, Cheng contends that other than evidence that he opened the HSBC Account and received the Disclosure, his personal understanding of the account's operating and accrual of interest should be deemed irrelevant for any purpose, including class certification. In light of this incorrect position, Cheng contends that the District Court should have ignored Cheng's own undisputed statements when considering whether he was able to represent the class.

This is wrong for several reasons. First, the assessment of adequacy is fundamental to the class certification process. It is well-established in this Circuit, that a class representative should be honest about the facts related to his case and that a representative's dishonesty can impact on his qualification as a class representative. The District Court appropriately questioned Cheng's honesty. Second, Cheng is wrong that all ambiguous "form" agreements must be construed

15

against the drafter. Cheng's cases almost uniformly involve form mortgages and indentures used by numerous banks throughout the country, not a single's bank unique disclosure relating to the opening an account. Indeed, to resolve the ambiguity identified by the District Court, *Cheng* sought to use extrinsic evidence, including internal memoranda and emails related to the creation of the DSA, the deposition testimony of several representatives of HSBC and an affidavit of a purported expert retained by Cheng to testify about why HSBC's disclosure should be read in Cheng's favor.  SA-216-17. Moreover, if Cheng was so sure that the case was de facto won in his favor upon a finding of ambiguity, he should have sought summary judgment and would not now be trying to appeal the District Court's denial of HSBC's summary judgment motion in an effort to effectively bury the evidence after previously relying upon it.

The District Court also properly dismissed Cheng's EFTA claim.  That statute and the federal regulation that implements it require banks to disclose certain specific information, including any applicable fees or charges, involving electronic fund transfers.  But the statute does not require a bank to disclose every possible consequence of an electronic transaction.  The District Court properly rejected Cheng's attempt to manufacture an EFTA claim by characterizing allegedly uncredited interest as a "fee" or "charge" that HSBC was required to disclose.

The Court therefore should affirm the District Court's judgment.

16

## STANDARD OF REVIEW

The Court reviews a district court's refusal to certify a class for an abuse of discretion. *See Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1999); *Mazzei v. Money Store*, 829 F.3d 260, 268 (2d Cir. 2016). A district court's factual findings on which its class certification decision is premised are subject to clear error review. *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 130–31 (2d Cir. 2010). A district court abuses its discretion only when "(1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

The District Court's dismissal of Cheng's EFTA claim is subject to de novo review. *See McCabe v. Lifetime Entm't Servs., LLC*, 761 F. App'x 38, 40 (2d Cir. 1998).

## ARGUMENT

### I. The Court has no jurisdiction over Cheng's appeal from the denial of HSBC's motion for summary judgment.

Federal law is clear that this Court has jurisdiction over appeals from all "final decisions" of the district courts in this circuit. *See* 28 U.S.C. § 1291. Orders denying motions for summary judgment ordinarily "do not qualify as 'final decisions' subject to appeal." *Maye v. City of New Haven*, 89 F.4th 403, 406 (2d Cir. 2023) (citing

17

*Ortiz v. Jordan*, 562 U.S. 180, 188, (2011)). Thus, a "district court's decision denying a motion for summary judgment is not appealable to this Court." *Weiss v. Union Cent. Life Ins. Co.*, 28 Fed. Appx. 87, 89 (2d Cir. 2002); *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 129–32 (2d Cir. 1999). Although there is an exception to this general rule, it has no application here because it involves motions for summary judgment that are based on immunity defenses. *See Maye*, 89 F.4th at 406.

In this appeal, Cheng purports to appeal the District Court's order denying HSBC's motion for summary judgment, in which the District Court considered extrinsic evidence in construing the Disclosure. Because the Court has no jurisdiction to review orders denying motions for summary judgment – in this case, an order that was in Cheng's favor – the Court should reject his challenge to the basis for the District Court's ruling on HSBC's motion for summary judgment.

## II. The District Court did not abuse its discretion in denying Cheng's Motion for Class Certification.

Citing relevant Second Circuit authority, the District Court's Order denying Cheng's Motion cogently explains that if a putative class representative is not credible or is subject to unique defenses not applicable to the absent class members, adequacy of representation is absent. The District Court reasoned:

> The statements he made in his 2019 phone calls are compelling evidence that he understood that, just as HSBC claims, he would not begin accruing interest until HSBC had his cash on hand. He repeatedly expressed concerns about HSBC failing to post his deposit to his account when he believed they had his money on hand, but never

18

expressed his supposed belief that interest should have started to accrue as soon as he initiated the deposit, regardless of whether HSBC had the cash on hand. Since plaintiff now seeks to establish *that he was misled to believe (and in fact believed) that interest would begin accruing as soon as he initiated a deposit, he faces an uphill battle on a core element of his claims*. Plaintiff's path to recovery is therefore obstructed by a key problem that other members of the prospective class do not share.

A-144 (emphasis added).

This evidence, the District Court concluded, revealed that Cheng "knew precisely what he was doing and that he and HSBC shared the same understanding about what the key term 'you deposit' meant."[2] A-145. The District Court also concluded that Cheng's "subsequent contradiction of those statements (in an apparent attempt to salvage his claims)" during his deposition, his conflicting testimony about whether he read the Disclosures, and his relevant litigation and banking history compounded his inadequacy as a class representative. A-145.

Cheng's challenges the District Court's order denying his Motion for Class Certification by arguing that the District Court could not consider evidence of his pre-litigation telephone calls because (1) the Disclosure is supposedly unambiguous in his favor; and (2) even if the Disclosure were ambiguous, the District Court erred

---

[2]     These statements are consistent with the District Court's summary judgment decision, which surmised this case might be "a lawsuit of opportunity" which Cheng only discovered at some point after his calls with HSBC "when, for the first time, he actually read and considered (and possibly spoke to his lawyer about) the interest accrual language." A-135.

in considering the evidence of his telephone calls. The Court should reject these arguments for several reasons.

### A. The District Court properly evaluated evidence of Cheng's credibility and litigation history in ruling on his Motion for Class Certification.

To prevail on his Motion for Class Certification, Cheng was required to affirmatively demonstrate his compliance with Rule 23(a)(4) by proving by a preponderance of the evidence that he would fairly and adequately protect the interests of the putative class. Fed. R. Civ. P. 23(a); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (observing that a party seeking class certification must affirmatively demonstrate his compliance with Rule 23); *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) (holding that a party moving for certification meets it burden by establishing Rule 23's requirements by a preponderance of the evidence).

When a court decides a motion to certify, it "must assure itself that the named representative will adequately protect the interests of the class." *Sosna v. Iowa*, 419 U.S. 393, 403 (1975). Because class representatives stand in a fiduciary relationship with the class, the adequacy requirement "focuses on the fitness of purported class representatives to competently discharge the responsibility of litigating the case on behalf of absent class members." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 99 (E.D.N.Y. 2012); *see also Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541,

549–50, (1949) (class representative is a fiduciary, and interests of the class are "dependent upon his diligence, wisdom and integrity"). Thus, courts "may consider the honesty and trustworthiness of the named plaintiff," as well as whether the plaintiff would be subject to unique defenses, in evaluating his adequacy. *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998); *see Panzirer v. Wolf* 663 F.2d 365, 368–69 (2d Cir. 1981), *vacated sub nom. Price Waterhouse v. Panzirer*, 459 U.S. 1027 (1982) (the "credibility of a plaintiff may be considered by the trial judge in determining the plaintiff's adequacy as a class representative").

A court should deny class certification if the putative representative is not honest or ethical enough to discharge this fiduciary duty or if he is subject to unique defenses not applicable to the absent class members. *See Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983). In *Savino*, for example, this Court affirmed the district court's determination that the plaintiff was inadequate to serve as class representative because the inconsistencies in his testimony "surely would create serious concerns as to his credibility at any trial." 164 F.3d at 87; *see also Buzoiu v. Risk Mgmt. Alternatives, Inc.*, No. CIV.A. 03-3579, 2004 WL 1505061, at *6-7 (E.D. Pa. June 14, 2004) (plaintiff was inadequate because inconsistencies between her deposition testimony and prior conversations would give defense counsel "ample ammunition for cross-examination if she chose to attack" credibility).

In considering whether a class representative's credibility may preclude a finding of adequacy, "courts look to personal characteristics only insofar as they touch upon the lawsuit." *Torres v. Gristede's Op. Corp.*, No. 04 Civ. 3316, 2006 WL 2819730, at *15 (S.D.N.Y. Sept. 29, 2006) (quoting *Jane B. by Martin v. New York City Dep't of Soc. Servs.*, 117 F.R.D. 64, 71 (S.D.N.Y. 1987)); *Martin*, 117 F.R.D. at 71 (court's inquiry "is directed at improper or questionable conduct arising out of or touching upon the very prosecution of the lawsuit."). For instance, in *Panzirer v. Wolf*, this Court affirmed the district court's refusal to certify a securities fraud class action due to the plaintiff's lack of credibility. *Panzirer*, 663 F.2d at 368-69. The Court observed that the plaintiff "gave no less than four versions of her conversation with her broker," which the district court was entitled to consider in "determining the plaintiff's adequacy as a class representative." *Id.* at 368 ("Judge Motley acted well within her discretion in concluding that Zelda Panzirer's lack of credibility rendered her an inadequate class representative.").

A district court reached a similar result in *Fishon v. Peloton Interactive, Inc.*, No. 19-11711, 2022 WL 179771, at *10 (S.D.N.Y. Jan. 19, 2022). Prior to that litigation, Fishon had posed as a lawyer and sent emails to Peloton complaining about problems with his Peloton hardware and customer service experiences. But Fishon's pre-litigation complaints did not involve the issue in the lawsuit – *i.e.*, the reduced content in Peloton's on-demand library. Moreover, Fishon "gave testimony

22

regarding those emails that was evasive at best" during the litigation. The court concluded that these issues, which were unique to Fishon, could become the focus of cross examination and unique defenses at trial, to the detriment of the class.

The court reasoned that Fishon's misconduct was not merely peripheral to the allegations in the lawsuit, but instead was central to those allegations:

> The evidence that Fishon lied to Peloton in the months leading up to the lawsuit and that he did so in order to get service from Peloton *without mentioning any concern about the size of the library undercuts a central allegation of Plaintiffs. It could well suggest to the jury that Fishon's purported later concern about the size of the library was contrived and that the entire basis for the lawsuit was his pique at the company's poor customer service.* The underlying evidence and Fishon's misleading answers at deposition would be admissible both as "specific instances" of conduct to undermine his character for truthfulness or untruthfulness, *see, e.g.*, Fed. R. Evidence 608(b) (explaining that a court may, on cross-examination, allow specific instances of a witness's conduct "to be inquired into if they are probative of the character for truthfulness or untruthfulness" of the witness) and as substantive evidence of prior statements inconsistent with what a jury might conclude is his later feigned concern about the size of the library.

*Id.* at *10; *Savino*, 164 F.3d at 87 (affirming denial of certification based on inadequacy where representative plaintiff "offered differing accounts about the letters that form the very basis for his lawsuit [which] surely would create serious concerns as to his credibility at any trial").

*Buzoiu v. Risk Mgmt. Alternatives, Inc.*, No. CIV.A. 03-3579, 2004 WL 1505061, at *6-7 (E.D. Pa. June 14, 2004), also is instructive.  In *Buzoiu*, the plaintiff's deposition testimony contradicted prior recorded phone calls between her

23

and the defendant. *Id*. at *7. The court noted that, despite these contradictions, the plaintiff might be able to defeat summary judgment and a jury could find in her favor, but "that is not the standard by which Buzoiu's adequacy as a class representative is assessed." *Id*. (emphasis added). Because of the significant inconsistencies between Buzoiu's deposition testimony and real-time statements, defense counsel "would have ample ammunition for cross-examination if she chose to attack Buzoiu's truthfulness as to when she received the letter, how many phone calls she made to RMA, when she made them, [and] what was said to her during the phone calls …." *Id*. at *6. As a result, Buzoiu was deemed an inadequate class representative and could only proceed with her individual claim.

When viewed against this legal backdrop, the District Court had ample discretion to deny Cheng's Motion for Class Certification. In his pre-litigation calls with HSBC, Cheng repeatedly acknowledged that he expected his money to begin accruing interest when HSBC received them, and his only complaint stemmed from his mistaken belief that HSBC received the funds on November 26, days before it credited them to his account:

> *The thing I am talking about, HSBC receive the money on November 26. It did not post to my account.* You already have the money on hand, but you intentionally did not post the account. … *So this is a thing that I have problem with. ...* [I]f the process takes long, that's fine! But the problem I am having is HSBC receive the money…. *So my concern is after HSBC receive the money, you did not post it.* You intentionally hold it and wait for couple days. To me, that's not acceptable.

SA-108.

These calls are compelling evidence that before the litigation began, Cheng shared HSBC's interpretation of the Disclosure that Cheng would not begin accruing interest until HSBC received his funds. Thus, this evidence undercuts the central allegation in Cheng's lawsuit—that HSBC's deceptive conduct was its purported promise to pay interest when a customer initiates an ACH transaction. It could also suggest to the jury that Cheng's allegations about that purported promise were contrived for the purpose of this litigation. *See Fishon*, 2022 WL 179771, at *11 (plaintiff was inadequate when his pre-litigation complaints differed from his subsequent litigation claim because they could suggest that the plaintiff's litigation claim "was contrived"). For this reason, the District Court correctly determined that evidence of Cheng's pre-litigation phone calls with HSBC would subject him to a unique defense and rendered Cheng inadequate to serve as a class representative. *Monaco v. Sullivan*, 737 Fed. Appx. 6, 16 (2d Cir. 2018) (affirming district court denial of class certification on the ground that putative class representative was subject to unique defenses).

Apart from this ground, the District Court was entitled to deny Cheng's Motion for Class Certification due to inconsistencies in his story. For example, in an effort to downplay the damaging evidence of his telephone calls, Cheng repeatedly tried to recharacterize the statements he made during those calls. A-102-

25

05, 133. The District Court also noted Cheng's contradictory testimony about whether he had read the Disclosure. During his deposition, Cheng initially answered "Nope" when asked if had read the disputed language prior to making the November Transfer. SA-59. But he subsequently contradicted that answer, testifying that he *had* read the Disclosure and other Account documents when he opened the Account. SA-200. The District Court correctly concluded that Cheng's opportunistic, contradictory testimony on key issues would further undermine his claims. *See Savino*, 164 F.3d at 87 (court properly considers named plaintiff's credibility and truthfulness in assessing his adequacy).

In addition, the District Court reasoned that Cheng's history of lawsuits against other banks using the same counsel further weakened his adequacy as a class representative. *See Barry B. Roseman, D.M.D., M.D., Profit Sharing Plan v. Sports and Recreation*, 165 FRD 108, 111 (M.D. Fla. 1996) (plaintiff's litigation history was relevant to his adequacy as a class representative); *In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Sec. Litig.*, 149 F.R.D. 506, 508 (D. Del. 1993) (same). Cheng began filing complaints with regulators and lawsuits against banks on or around the time of his November 2019 phone calls to HSBC:

- In late November 2019, Cheng filed a complaint against J.P. Morgan Chase with the CFPB. SA-230.

- On March 25, 2020, Cheng filed this lawsuit.

- A few days later, Cheng filed suit against J.P. Morgan Chase based the same facts alleged in his CFPB Complaint. *Cheng v. J.P. Morgan Chase*, No. 20-cv-1636 (E.D.N.Y.).

- In June 2021, Cheng filed a third suit, this time a purported class action against TD Bank, again, with the same counsel, alleging that TD Bank engaged in a purportedly "deceptive practice" in connection with an alleged promise to pay him $200 as a referral bonus. SA-169, 224. After the District Court dismissed Cheng's claims against TD Bank, Cheng appealed and then abandoned the supposed interests of the putative class. *See Cheng v. T.D. Bank, N.A.*, No. 22-1633, 2022 WL 18461488, at *1 (2d Cir. Sept. 30, 2022).

Cheng's contemporaneous history of filing lawsuits over alleged deceptive acts, which included abandoning the interests of the class after filing an appeal, compounded his inadequacy as a class representative. *See Goetsch v Shell Oil Co.*, 197 F.R.D. 574, 579 (W.D.N.C. 2000) (plaintiff's history of abandoning interests of the class by settling individually weighed against his adequacy in a subsequent suit).

In sum, the District Court was entitled to consider Cheng's pre-litigation calls, his subsequent attempt to contradict those calls, his contradictory testimony about whether he read the disputed language, and his patten of deceptive-conduct suits against banks as support for its conclusion that Cheng is not an adequate class representative.

### B. Evidence of Cheng's pre-litigation telephone calls directly relates to the issues in this case.

In this Court, Cheng contends that evidence of his pre-litigation telephone calls with HSBC is irrelevant to his breach-of-contract claim, and the District Court

27

therefore could not consider that evidence in evaluating his adequacy as a class representative. Br. at 34. Cheng never argued that the District Court could not consider that evidence in his Motion to Certify Class Action. In any event, Cheng is mistaken for multiple reasons.

### 1. Evidence of Cheng's telephone calls is relevant to Cheng's GBL § 349 claim.

Cheng's contention that evidence of his pre-litigation telephone calls are supposedly irrelevant to his breach-of-contract claim wholly ignores Cheng's separate GBL § 349 claim. Section 349 of New York's General Business Law prohibits deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state. N.Y. Gen. Bus. Law § 349(a). To establish a prima facie case under Section 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result of the deceptive act. *See Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000); *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000). As to the causation element, courts in this Circuit consistently hold that "in order to have been injured by the defendant's deceptive act, a plaintiff must have been personally misled or deceived." *Ritchie v. N. Leasing Sys., Inc.*, No. 12-CV-4992 (KBF), 2016 WL 1241531, at *21 (S.D.N.Y. Mar. 28, 2016) (quoting *LaCourte v. JP Morgan Chase & Co.*, No. 12 Civ. 9453 (JSR), 2013 WL 4830935, at *10 (S.D.N.Y. Sept. 4,

28

2013)); *see Lin v. Canada Goose US, Inc.*, No. 21 CIV. 7614 (LGS), 2022 WL 16926312, at *5 (S.D.N.Y. Nov. 14, 2022).

In the District Court, Cheng alleged that HSBC's Disclosure was deceptive in violation of Section 349 because HSBC did not apply interest on the day an ACH was initiated. A-24. To support this claim, Cheng was required to adduce evidence that he was personally misled or deceived. *See Ritchie*, 2016 WL 1241531, at *21. But Cheng's telephone calls with HSBC show that Cheng was *not* misled or deceived by the Disclosure. To the contrary, those calls show that Cheng shared HSBC's interpretation of the Disclosure and understood that he would not begin accruing interest until HSBC received his funds. A-103-04. Accordingly, evidence of his telephone calls with HSBC directly contradicts the premise of his GBL deceptive-conduct claim, which subjects Cheng to a unique defense, and renders him an inadequate class representative.

Because this evidence relates to Cheng's GBL § 349 deceptive-conduct claim, the District Court was entitled to consider it in denying Cheng's Motion for Class Certification, regardless of whether the evidence is relevant to Cheng's separate breach-of-contract claim. *See Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983) ("Since plaintiffs' testimony on an issue critical to one of their two causes of action was subject to sharp attack, the district court reasonably concluded that their credibility in general was sufficiently in doubt to justify denying them a fiduciary

29

role as class representatives with respect to both claims.").[3] For this reason alone, the Court should affirm the District Court's judgment.

### 2. Evidence of Cheng's telephone calls is relevant to his breach of contract claim.

The District Court was also entitled to consider Cheng's telephone calls in connection with his breach-of-contract claim. Cheng's argument to the contrary is based on two weak premises. First, Cheng contends the District Court erred in concluding the Disclosure is ambiguous. Second, he argues that even if the Disclosure were ambiguous, the District Court should not have considered any extrinsic evidence, including Cheng's telephone calls. Br. at 6. Cheng has waived these arguments and, in any event, they fail on the merits.

### a. The Court should reject Cheng's contention that the Disclosure is unambiguous in his favor.

As to his first premise, Cheng has waived his argument that the District Court erred when it found the Disclosure ambiguous in its order denying HSBC's motion for summary judgment.

The law in this Circuit is "well settled that arguments not presented to the district court are considered waived and generally will not be considered for the first

---

[3]    In addition, because Cheng testified that he did not read the Disclosure before he made the November 2019 Transfer, the Disclosure could not have caused his alleged injury under New York law. *See Bibicheff v. PayPal, Inc.* No. 2:17-CV-4679 (DRH)(AYS), 2020 WL 2113373, at *4 (E.D.N.Y. May 4, 2020), *aff'd*, 844 F. App'x 394 (2d Cir. 2021) (citing New York law and holding that plaintiff failed to show causation because he did not see the allegedly deceptive statements).

time on appeal." *Ginn v. Concord Arena Parking, LLC*, No. 23-429-CV, 2024 WL 658836, *2 (2d Cir. Feb. 16, 2024) (citing *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 50 (2d Cir. 2015)). Waiver is particularly appropriate when the appellant took the opposite position in the district court from the position he advances on appeal. *Id.* (holding that appellant waived argument that a condition precedent was ambiguous because he argued in the district court that the condition precedent was unambiguous).[4]

As in *Ginn*, Cheng has waived his appellate argument that the Disclosure unambiguously supports his position. He never filed a motion asking the District Court to construe the Disclosure unambiguously in his favor. In fact, Cheng opposed HSBC's motion for judgment on the pleadings by arguing that, "[a]t a minimum, the phrase is ambiguous, preventing this litigation from being resolved as a matter of law on the pleadings." SA-29; *see also* SA-34. Cheng also cited his expert's opinion that the Disclosure is "subject to multiple interpretations by a consumer." SA-36. In deciding HSBC's motion for judgment on the pleadings, the District Court *agreed with Cheng* that the Disclosure is ambiguous and refused to dismiss Cheng's claims

---

[4]    *See also Pullman v. Alpha Media Pub., Inc.*, 624 Fed. Appx. 774, 778 (2d Cir. 2015) (summary order) (refusing to consider appellant's argument that a settlement agreement was not binding because she took the opposite position in the district court by moving to enforce the agreement); *Paese v. Hartford Life & Accident Ins. Co.,* 449 F.3d 435, 446 (2d Cir. 2006) ("The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below ... waiver will bar raising the issue on appeal.").

on this ground. Cheng never asked the District Court to reconsider that ruling. Having successfully urged the District Court to deny the motion to dismiss because the Disclosure is "at best ambiguous," (SA-34) Cheng cannot now take the opposite position that the District Court *erred* in holding that the Disclosure is ambiguous.

In any event, Cheng's argument that the Disclosure is unambiguous in his favor is wrong on the merits. Under New York law, ambiguous language is that which suggests "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 174 (2d Cir. 2001). According to Cheng, the Disclosure statement that "[i]nterest begins to accrue on the Business Day you deposit noncash items (e.g. checks)" unambiguously means that interest begins to accrue when he first initiated an ACH transaction to transfer funds from his Goldman Sachs account to his HSBC Account. But the District Court properly determined that it would be reasonable to interpret the term "deposit," in the ACH context, as "referring to the act of placing money in the custody of the bank, and not merely the act of requesting an ACH transfer." A-30.

Cheng contends that "the word 'deposit' as ordinarily used in the banking business, means the placing of money, checks, and the like with a bank." Br. at 27.

But this definition is irrelevant in the ACH context. When a customer makes a cash or check deposit, the customer places that money or check with the bank. With an ACH transaction, in contract, the customer does not place anything with the receiving bank on the day the customer initiates an ACH transaction. The District Court did not err in failing to construe the Disclosure as unambiguously supporting Cheng's position.

> **b.** **The Court should reject Cheng's contention that the District Court erred in considering extrinsic evidence.**

Cheng's second contention—that, even if the Disclosure is ambiguous, the District Court erred in considering extrinsic evidence of his telephone calls with HSBC—fails because Cheng waived it, and it is contrary to New York contract law.

Cheng waived this argument by inviting the District Court to consider extrinsic evidence (including his telephone calls) in construing the Disclosure. In the District Court, HSBC moved for summary judgment on the ground that the extrinsic evidence (including Cheng's telephone calls) supported HSBC's interpretation of the Disclosure. Cheng responded to HSBC's motion for summary judgment by offering his own extrinsic evidence that supposedly supported Cheng's proffered interpretation of the Disclosure. SA-199-201. Indeed, Cheng spent *five pages* of his response to HBSC's motion for summary judgment discussing the telephone calls, arguing that they "confirm" his interpretation of the Disclosure. SA-

202-04, 218-19. Cheng also argued that under New York law, a court determines the contracting parties' intent by "looking to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." SA-206. The District Court agreed with Cheng, holding that the extrinsic evidence defeated HSBC's summary judgment motion on Cheng's claims. A-133-37. Given that Cheng himself encouraged the District Court to consider his telephone calls in construing the Disclosure, Cheng has waived his argument in this Court that the District Court erred in considering that exact evidence. *Ginn*, 2024 WL 658836, at *2.

Regardless, Cheng's argument that the District Court erred in considering his telephone calls even if the Disclosure were ambiguous is wrong on the merits. As a threshold matter, Cheng baldly assumes that the Disclosure is a "contract of adhesion." Br. 4, 30, 33, 36. But under New York law, the "elements of a contract of adhesion are (1) a necessity of life; (2) a contract for the excessive benefit of the offeror; (3) an economic or other advantage of the offeror; and (4) the offer of the proposed contract on a take-it-or-leave-it basis." *In re Vargas Realty Enterprises, Inc.*, 440 B.R. 224, 237 (S.D.N.Y. 2010) (applying New York law). The "*sine qua non* of a contract of adhesion is that the contract's subject matter is a necessity of life." *Bank of Am. v Cooper*, 63 Misc 3d 1214 n.3 (A) [Civ. Ct. 2019] (unreported) (internal citations omitted) (holding that credit card was not a "necessity of life"). Cheng, who owns dozens of accounts at multiple banks (A-141), offers no evidence

or argument that his HSBC Account is a "necessity of life," and it plainly is not. Cheng has multiple bank accounts, and he selected the HSBC Account because of its interest rate.

In addition, New York law is settled that when the terms of a written contract are ambiguous, "a court may turn to evidence outside the four corners of the document to ascertain the intent of the parties." *CIBC World Markets Corp. v. TechTrader, Inc.*, 183 F. Supp. 2d 605, 611 (S.D.N.Y. 2001). The parties are "entitled to submit extrinsic evidence as to the intent with which they entered into" the contract, and the factfinder should consider that evidence in determining whether the plaintiff proved the intent of the parties and breach. *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 399 (2d Cir. 2009). Extrinsic evidence may include "the acts and circumstances surrounding execution of the ambiguous term," *Roberts v. Consol. Rail Corp.*, 893 F.2d 21, 24 (2d Cir. 1989), and the parties' course of conduct throughout the life of the contract, *Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006).

As in those cases, Cheng's recorded statements do not reflect merely his undisclosed, subjective understanding, intent or opinion. They reflect his and HSBC's mutual understanding that interest on his ACH fund transfers would begin to accrue when HSBC received the funds. Moreover, even if the subjective interpretation of each putative class member often will not defeat class certification

35

on commonality or predominance grounds, Cheng's own understanding of the Disclosure is relevant to whether he would be an adequate representative of the putative class. *See Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1030 (8th Cir. 2010) (declining to certify a class because the evidence was not clear that "any members of the putative class, let alone a substantial number of them originally understood the contract language in the manner that the plaintiffs now propose … and the plaintiffs themselves attached little significance to the phrase at issue").

The cases on which Cheng relies are distinguishable and do not compel a different result. For example, *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.* 691 F.3d 1039, 1048 (2d Cir. 1982) involved a successor obligor clause in an indenture. The Court noted that this was a "boilerplate" clause that was standard in "virtually all indentures" and was different from "contractual provisions which are peculiar to a particular indenture." *Id.* Because the clause was used in "virtually all indentures," it was important for the Court to give the clause a consistent, uniform interpretation to ensure "effective functioning of our financial markets." *Id.* Similarly, in *Akanthos Capital Management, LLC v. CompuCredit Holdings Corp.*, 677 F.3d 1286, 1298 (11th Cir. 2012), the court followed *Sharon Steel* in interpreting the "plain language" of a standard clause used in all indentures.

In *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 436-37 (1st Cir. 2013), also cited by Cheng, the court considered a "uniform clause used in millions

of mortgages nationwide by many different lenders" that was "prescribed by the [Federal Housing Authority] pursuant to federal law." The court therefore gave it "one uniform meaning rather than multiple inconsistent meanings," – i.e., the meaning ascribed to it by the federal government when it drafted the federal regulation. *Id.* ("The role that the Covenant plays in an important regulatory scheme requires that result."). And as in *Kolbe*, the court in *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014), considered a mortgage covenant that was prescribed by a federal regulation, was "included in millions of mortgage contracts across the country," and did not "vary by lender or borrower." *Id.* Because the "United States wrote the standard-form covenants and required them to be included, verbatim, in each FHA-insured mortgage-loan contract," the covenant had to be "consistently interpreted in every contract in which it appears" because of the federal regulatory concerns at issue. *Id.*

In this case, the language in the Disclosure was not required to be included in standard form mortgage agreement as in *Kolbe* and *Faez*. Nor does the language appear in every disclosure issued by every bank across the country, as was the case with the indentures at issue in *Sharon Steel* and *Akthanos*. Moreover, Cheng cites these cases for the proposition that courts do not consider extrinsic evidence of the parties' subjective intent even when a form contract is *ambiguous*. Br. at 30. None of these cases, however, involves a unique document related to a checking account

37

offered by a single bank. *See Sharon Steel*, 691 F.3d at 1048; *Akanthos Capital Mgmt.*, 677 F.3d at 1298; *Kolbe*, 738 F.3d at 436-37; *Feaz*, 745 F.3d at 1104. Cheng's reliance on these cases is misplaced.

Cheng also misstates the rule of *contra proferentem*. Br. at 34. "New York applies [the rule of *contra proferentem*] only as a matter of last resort after all aids to construction have been employed without a satisfactory result." *Gillespie v. St. Regis Residence Club, New York Inc.*, 461 F. Supp. 3d 96, 117 (S.D.N.Y. 2020) (alteration in original) (quoting *Albany Sav. Bank, F.S.B. v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997)). Thus, ambiguities in a contract should be construed against the drafter "only if after the ordinary rules of construction *and consideration of extrinsic evidence*, the ambiguities remain." *Gillespie*, 461 F. Supp. 3d at 117 (alteration in original).

In *Gillespie*, for example, the court declined to construe the ambiguous language against the drafter because "the text and the available extrinsic evidence run counter" to the plaintiff's proposed interpretation. *Gillespie*, 461 F. Supp. 3d at 117; *see Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261, 1287 (D. Utah 2017) (holding that testimony would help resolve doubts about the plaintiffs "understood in contracting with Wells Fargo); *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare*, 601 F.3d 1159, 1176-77 (11th Cir. 2020) (noting that extrinsic evidence should be considered in evaluating class certification of claim based on form contract

where "individualized extrinsic evidence beads heavily on the interpretation of the class members' agreements"); *Axiom Investment Advisors LLC v. Deutsche Bank AG*, No. 15-9945, 2018 WL 4253152, at *8 (S.D.N.Y. Sept. 6, 2018) (denying certification due to lack of predominance in connection with form contract where extrinsic evidence proved that class members and bank both had same understanding of application of contract terms).

Here, the District Court concluded that the Disclosure language is ambiguous and, consistent the New York law discussed above, properly permitted the parties to adduce extrinsic evidence regarding its meaning. In responding to HSBC's motion for summary judgment, Cheng offered such extrinsic evidence, including evidence of his telephone calls with HSBC, to support his interpretation of the Disclosure. The evidence of Cheng's telephone calls with HSBC thus is relevant to his breach of contract claim, in addition to his GBL § 349 claim. Accordingly, the District Court was entitled to consider that evidence when assessing Cheng's adequacy to serve as a class representative.

In summary, the Court did not abuse its discretion when it ruled that Cheng was not an adequate class representative. Cheng's quixotic effort to strip the District Court of its power to consider the fact that Cheng completely changed his story when deciding whether to certify a class should fail. Over HSBC's objections, the District

Court felt the case could go to a jury – but correctly held that Cheng was not suitable to represent the absent putative class members.

## III. The District Court correctly dismissed Cheng's EFTA claim.

The Court also should affirm the District Court's dismissal of Cheng's EFTA claim. *See* 15 U.S.C. § 1693c(a). EFTA requires banks to disclose certain specific information, including any applicable fees or charges, involving electronic fund transfers ("EFTs"). *Id.* According to Cheng, the Disclosure's statement that "Interest begins to accrue on the Business Day you deposit noncash items (e.g., checks)" violates EFTA. The District Court correctly held that EFTA does not require a bank to disclose every possible consequence of an electronic transaction, and the allegedly uncredited interest at issue is not a "charge" or "fee" requiring disclosure. A-26. Cheng's brief fails to demonstrate any error with the District Court's conclusion.

### A. EFTA is administered through Regulation E

Section 1693c(a) of EFTA provides in relevant part that the "terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed at the time the consumer contracts for an electronic fund transfer service, *in accordance with regulations of the [Consumer Financial Protection] Bureau*." 15 U.S.C. § 1693c(a) (emphasis added). Thus, Congress explicitly delegated to the Bureau the authority and responsibility to enact regulations governing the initial electronic fund transfer disclosures a financial institution such as HSBC must make,

40

to include the disclosures expressly listed in Section 1693c(a)(1)-(10). *Id.*; *see also* 15 U.S.C. § 1693b(a)(1) ("the Bureau shall prescribe rules to carry out the purposes of this subchapter").[5] Congress also required the Bureau to issue model clauses for optional use by financial institutions to "facilitate compliance with the disclosure requirements of section 1693c." 15 U.S.C. § 1693b(b).

In accordance with these congressional mandates, the Bureau promulgated regulations codified at 12 C.F.R. § 1005 ("Regulation E"), which implement EFTA. *L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 116 (2d Cir. 2020) (noting that EFTA is implemented through Regulation E). As relevant here, Section 1005.7 of Regulation E implements EFTA's initial disclosure requirements. Section 1005.7(a) provides that banks "shall make *the disclosures required by this section* at the time a consumer contracts for an [EFT] or before the first [EFT] is made involving the consumer's account." 12 C.F.R. § 1005.7(a) (emphasis added). Section 1005.7(b) then lists the eleven specific disclosures a bank is required to provide. *Id.* § 1005.7(a).

A bank's conduct is not actionable if it complies with Regulation E or the Bureau's Official Commentary regarding the regulations. *See* 15 U.S.C. § 1693m (d); *Azose v. J.P. Morgan Chase Bank*, No. 07-CV-4995, 2010 WL 376632, at *6

---

[5]  Rulemaking authority under EFTA generally transferred from the Federal Reserve Board to the Bureau in July 2011 pursuant to the Dodd-Frank Act. The Bureau restated Regulation E at 12 C.F.R. Part 1005 in December 2011.

(E.D.N.Y. Jan. 26, 2010), *aff'd sub nom., Azose v. J.P. Morgan Chase Bank, Nat. Ass'n*, 411 Fed. Appx. 387 (2d Cir. 2011).

> **B.    The District Court correctly concluded that HSBC did not violate EFTA or Regulation E.**

Citing no authority, Cheng argues that Section 1693c(a) of EFTA imposes on banks vague disclosure obligations beyond the disclosures specifically listed in Section 1693c(a)(1)-(10) and Section 1005.7 of Regulation E.  Cheng is mistaken.  As discussed above, Section 1693c(a) plainly states that banks shall disclose the terms and conditions of EFTs "in accordance with regulations of the Bureau," to include the specific disclosures identified in Section 1693c(a)(1)-(10).  Regulation E, in turn, requires banks to make the initial "disclosures required by this section." 12 C.F.R. § 1005.7(a).  Thus, courts routinely hold that banks do not have disclosure obligations beyond those specifically in Section 1693c(a)(1)-(10) and Section 1005.7 of Regulation E.

For example, the court in *Azose v. Washington Mutual* considered whether the bank violated Section 1693c(a) of EFTA by failing to give notice of a particular fee. 588 F. Supp. 2d 366, 374 n.2 (E.D.N.Y. 2008). The court reasoned that the bank's "liability, if any, would fall under" Regulation E's list of initial disclosures.  *Id.* Because the challenged conduct did not run afoul of the list, the court dismissed the EFTA claim.  *Id.*; *see also Olen v. N. Tier Retail, LLC*, 2012 WL 1580994, at *4 (D. Minn. May 4, 2012) (dismissing § 1693c(a) EFTA claim when plaintiff's allegations

42

did not amount to a violation of the disclosures listed in EFTA or Regulation E); *Archbold v. Sols. Fed. Credit Union*, 2012 WL 5617845, at *2 (W.D.N.Y. Nov. 15, 2012) (EFTA "requires that certain *specific* disclosures be made to consumers of the terms and conditions of electronic fund transfers") (emphasis added). As in these cases, the District Court correctly held that allegedly uncredited interest is not a term or condition of an EFT that HSBC was required to disclose under EFTA or Regulation E because EFTA does not require banks to "disclose every potential consequence of a fund transfer." A-31.

In addition, the District Court properly rejected Cheng's contention that allegedly lost interest constitutes a "charge" or "fee" that HSBC was required to disclose under EFTA and Regulation E. A-32. Under Section 1693c(a)(4) of EFTA, banks are required to disclose "any charges for electronic fund transfers or for the right to make such transfers." 15 U.S.C. § 1693c(a)(4). Regulation E implements that provision by requiring banks to disclose "[a]ny fees imposed by the financial institution for EFTs or for the right to make transfers." *See* 12 C.F.R. § 1005.7(b)(5). The Court should decline Cheng's invitation to misconstrue the terms "fee" and "charge" under EFTA and Regulation E to mean "allegedly lost interest."

When construing the terms of a statute or regulation, courts must read the terms to "convey their ordinary meaning, including as reflected in dictionary definitions." *United States v. Desposito*, 704 F.3d 221, 226 (2d Cir. 2013). The

District Court correctly concluded that the ordinary dictionary definitions of "fee" and "charge" make clear that those terms do not refer to an alleged loss of interest. To the contrary, "charge" means "the price demanded for something" or a "debit to an account." https://www.merriam-webster.com/dictionary/charge. A "fee" is a "a fixed charge" or "a sum paid or charged for a service." https://www.merriam-webster.com/dictionary/fee. Neither term can logically be construed to mean an unknown amount of interest that would accrue after funds are received by a bank.

The District Court properly relied on *Turner v. General Motors Acceptance Corp.*, which considered a similar issue under the Consumer Leasing Act. 980 F. Supp. 737, 742 (S.D.N.Y. 1997), *aff'd*, *Turner v. General Motors Acceptance Corp.*, 180 F.3d 451, 456 & n.5 (2d Cir. 1999) (collecting cases). In that case, Turner had an automobile lease agreement with General Motors. *Id.* at 738. Turner alleged that General Motors failed to disclose that it received earning credits and interest on Turner's security deposit, which amounted to "charges payable by [a] lessee" that General Motors was required to disclose under the Consumer Leasing Act. *Id.* at 741. The district court rejected the claim. It explained that, although Turner "los[t] the opportunity to earn interest and receive other benefits from his own bank when he transfer[red] the security deposit to [General Motors], this is an obvious opportunity cost inherent in the concept of a deposit. Inherent costs of this nature are not ... 'charges payable by the lessee' that must be disclosed under the [Consumer

Lending Act]." *Id.* at 742. *Turner* thus supports the conclusion that an alleged lost opportunity to earn interest also is not a "charge" or "fee" that a bank must disclose under EFTA or Regulation E. Accordingly, the District Court correctly determined that *Turner*'s sound logic applies to this EFTA case.

Cheng attempts to distinguish *Turner* by arguing that is unavailing. According to Cheng, *Turner* focused on the CLA's requirement that a lessor must disclose charges "payable by the lessee," and because unearned interest is not payable by the lessee, the lessor was not required to disclose it. Br. at 10. This is a distinction without a difference. Just as the CLA requires lessors to disclose charges that are payable by the lessee, Regulation E requires banks to disclose fees "*imposed by the financial institution* for electronic fund transfers or for the right to make transfers." 12 C.F.R. § 1005.7(b)(5). This regulation necessarily refers to fees imposed by the financial institution *on customers* when the customer makes EFTs. And just as an alleged lost "opportunity to earn interest" is not a "charge payable by the lessee" under the LCA, it also is not a charge or fee imposed by a bank under EFTA or Regulation E.

The Official Staff Interpretation of Section 1005.7 of Regulation E provides additional support for the conclusion that a "fee" is a specific sum a customer must affirmatively pay for an EFT service, as opposed to allegedly uncredited interest. The Official Interpretation states that an "institution is required to disclose all fees

45

for EFTs or the right to make them," but other "fees (for example, minimum-balance fees, stop-payment fees, or account overdrafts) may, but need not, be disclosed." 12 C.F.R. Part 1005, Supp. I ¶ 7(b)(5)(1); *see also id*. Part 1005, Supp. I, ¶ 7(b)(5)(2) ("A per-item fee for EFTs must be disclosed even if the same fee is imposed on nonelectronic transfers. If a per-item fee is imposed only under certain conditions, such as when the transactions in the cycle exceed a certain number, those conditions must be disclosed."). In contrast to these express fees that a bank must disclose, the Official Interpretations specify that the "requirement to disclose any fees assessed against the account does not include a finance charge imposed on the account during the statement period." *See* 12 C.F.R. Part 1005, Supp. I, ¶ 9(b)(3)-3. The Bureau's conclusion that an interest charge is not a "fee" or "charge" that must be disclosed renders Cheng's contention that unearned potential interest is a "fee" or "charge" that must be disclosed all the more implausible.[6]

---

[6] In addition, considering lost interest as a "charge" or "fee" would have dramatic, unintended consequences. Regulation E requires that periodic account statements provided to the customer must include the "amount of any fees assessed against the account during the statement period for electronic fund transfers, for the right to make transfers, or for account maintenance." 12 C.F.R. § 1005.9(b)(3). It would be impossible as a practical matter to disclose the amount of "lost" interest *in advance*, as Regulation E requires, given that the amount of the deposit and the rate when funds are received varies daily. *See* 12 C.F.R. § 1005.7(a) (disclosure must occur at the "time a consumer contracts for an electronic fund transfer service or before the first electronic fund transfer is made involving the consumer's account.").

In sum, these Official Interpretations reveal the Bureau's conclusion that the terms "charge" and "fee" mean a specific assessable sum a customer must pay to a bank in exchange for an EFT service, and they should inform the Court's construction of those terms. *See Yuille v. Uphold HQ Inc.*, 2023 WL 5206888, at *9 (S.D.N.Y. Aug. 11, 2023) (deferring to Official Interpretation of Regulation E's interpretation of the term "account"); *L.S. v. Webloyalty.com,* 954 F.3d at 116 (relying on the Official Interpretations of Regulation E); *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 760 F.3d 151, 163 (2d Cir. 2014) ("We generally give deference to an agency's interpretation of statutes that the agency administers.").

Although Cheng relies on *Berenson v. Nat'l Financial Serv., LLC*, 403 F. Supp. 2d 133 (D. Mass. 2005), to support his argument that allegedly lost interest constitutes a charge under EFTA, that case is inapposite and unpersuasive. *Berenson* involved Fidelity bank's bill-pay service. When customers used the bill-pay service, CheckFree held *and earned interest* on the customer's funds between the date the transfer was initiated and the date CheckFree transferred the funds to the ultimate payee. *Id.* at 139. The plaintiffs contended that "any interest gained by Fidelity between the transaction date and the date an intended payee actually receives the funds is a 'fee' that Fidelity was legally required to disclose" under EFTA. *Id.* at 137. The *Berenson* court cited no authority for its conclusion, and it was clearly swayed by the fact that Fidelity's service provider had "earn[ed] interest at the

47

expense of its customers" when it determined that "the interim loss" should have been disclosed. *Id*. at 151-52.

In the almost twenty years since *Berenson* was decided, it has never been cited by any court except the District Court in this case, which correctly disagreed with it. Moreover, *Berenson* is plainly distinguishable from this case.[7]  Unlike the facts in *Berenson*, HSBC did not earn or retain any interest at Cheng's expense between the time Cheng's initiated his ACH transfer and the time those funds reached his HSBC Account.  SA-180-82.  Indeed, HSBC could not have earned interest on funds before they actually reached HSBC.  Thus, *Berenson* is inapposite and should not inform the Court's analysis.

The other cases on which Cheng relies stand for the unremarkable proposition that a fee can be calculated on a percentage basis. *Deutsche Bank* Secs*., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 668 (S.D.N.Y. 2008), is a trade secret case involving an agreed-upon percentage formula used in a commercial agreement. *In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 357 (S.D.N.Y. 2011), is a price-fixing case related to fixed currency conversion fees based on percentages.

---

[7]     Cheng posits that that EFTA would indisputably apply if the Disclosure said, "All ACH transfers are subject to a transfer fee equal to two days of interest on the amount transferred at the rate applicable to deposits made into the account."  Br. at 22.  Cheng's hypothetical is irrelevant because the Disclosure does not have any such language.  More importantly, Cheng's hypothetical incorrectly assumes that HSBC retains customer interest as a fee.  Again, HSBC does not earn or retain any customer interest on ACH funds before those funds reach HSBC.  SA-180-82.

But whether certain fees can be calculated on a percentage basis is irrelevant to whether allegedly unearned interest constitutes a fee or charge in the first place. As discussed above in Section III.B, the District Court correctly concluded that allegedly unearned interest does not fall within the ordinary meanings of "fee" or "charge." The District Court properly dismissed Cheng's EFTA claim.

## CONCLUSION

For all of the foregoing reasons, the Court should affirm.

Dated:  April 26, 2024
New York, New York

HOLLAND & KNIGHT LLP

*/s Andrew J. Soven*
Andrew J. Soven
1650 Market Street, Suite 3300
Philadelphia, PA 19103
andrew.soven@hklaw.com
Tel:   (215) 252-9554
Fax:   (215) 867-6070

Qian (Sheila) Shen
787 Seventh Avenue
31st Floor
New York, NY 10019
qian.shen@hklaw.com
Tel:   (212) 513-3200
Fax:   (212) 385-9010

***Attorneys for Defendant-Appellee
HSBC Bank USA, N.A.***

50

### CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,166 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman, with footnotes in 13-point font.

/s Andrew J. Soven
Andrew J. Soven

### CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

/s Andrew J. Soven
Andrew J. Soven